No. 33,570

THE STATE OF KANSAS, ex rel. CLARENCE V. BECK, Attorney General, *Plaintiff,* v. B. L. GLEASON, *Defendant.*

(79 P. 2d 911)

Opinion filed June 11, 1938.

*Clarence V. Beck,* attorney general, and *Theo. F. Varner,* assistant attorney general, for the plaintiff.

*William H. Vernon, Vincent G. Fleming,* both of Larned, *James E. Smith, E. H. Hatcher* and *Frank H. McFarland,* all of Topeka, for the defendant.

*Hal E. Harlan, A. M. Johnston,* both of Manhattan, *Harry W. Fisher,* of Fort Scott, *Albert Faulconer, Kirke W. Dale, C. L. Swarts* and *Donald Hickman,* all of Arkansas City, attorneys for the Kansas Medical Society, as *amici curiae.*

The opinion of the court was delivered by

HARVEY, J.: This is an original proceeding in quo warranto, authorized by chapter 270 of the Laws of 1937, to oust defendant from the unlawful practice of medicine and surgery. The case is now presented for the determination of certain questions of law which arise upon the pleadings in advance of the trial of the facts, as authorized by G. S. 1935, 60-2704 and 60-2902. Therefore, it is deemed prudent to set out the pleadings.

The petition, omitting paragraphs 1 and 2 and the prayer, reads:

"3. That the defendant, B. L. Gleason, is not now, nor was he at the times hereinafter mentioned, licensed by the board of medical registration and examination of the state of Kansas, and is not now, nor was he at the times hereinafter mentioned, authorized to practice medicine and surgery as defined by the laws of the state of Kansas; that the defendant, B. L. Gleason, is now, and has been, at all times mentioned herein, lacking in the educational and professional qualifications to enable him to practice medicine and surgery, as defined by the law of the state of Kansas.

"4. That the defendant, B. L. Gleason, claims to have the right and privilege of practicing medicine and surgery, and does in fact, and has for many years past, engaged in the profession of the practice of medicine and surgery; that in the course of the defendant's practice of medicine and surgery, he has, and is now treating numerous patients in a hospital owned and operated by this defendant, located in Larned, Kansas, which said patients are treated by this defendant by medical treatment and by surgical treatment; that this defendant is without lawful power or authority to engage in the profession of treating patients for hire, either by prescribing medicine or by performing surgery; that the defendant is now, and has been, since the year 1915, a licensed osteopath under and by virtue of and pursuant to the statutes of the state of Kansas pertaining to osteopaths, and by reason of such license, is not empowered or privileged to engage in the practice of medicine and surgery, but is only authorized and empowered and privileged to engage in the practice of osteopathy, as the same was taught in legally incorporated colleges of osteopathy of good repute, in the year 1913, pursuant to G. S. 65-1201.

"5. That the defendant, B. L. Gleason, owns and operates within the city of Larned, Pawnee county, Kansas, a hospital, in which hospital divers and numerous patients have been and are being received for the purpose of receiving both medical and surgical treatment for the ills of said patients; that the defendant, B. L. Gleason, does in said hospital prescribe medicine for a fee to said patients and does perform surgical operations thereon for a fee, and does permit and authorize other licensed osteopathic physicians to engage in the practice of medicine and surgery defined by the law of Kansas therein; that the operation of such hospital by this defendant is in violation of the laws of the state of Kansas, and is an unlawful usurpation of power and privilege by this defendant.

"6. That by reason of the allegations hereinbefore set forth, the said defendant has intruded himself into the practice of medicine and surgery in the state of Kansas, and is now, and has been usurping the right, authority and privilege of practicing medicine and surgery in the state of Kansas without any warrant or authority of law, and that said defendant will, unless ousted therefrom by this court, continue to practice medicine and surgery in the state of Kansas without lawful authority so to do, and in violation of and in disregard of the statutory requirements of the state of Kansas."

The answer contains a general denial, admits the allegations of paragraphs 1 and 2 of the petition, and, omitting the prayer, reads:

"Defendant admits that he is not now, nor was he ever, licensed by the board of medical registration and examination of the state of Kansas, as alleged in paragraph 3 of said petition.

"Defendant admits that he is a duly licensed osteopathic physician and surgeon as alleged in paragraph 4 of said petition and states that as such he has for many years treated patients both medically and surgically, as alleged in said paragraph 4, and is now so doing.

"Defendant for his further answer states that he is authorized, empowered and privileged to engage in the practice of medicine and surgery, including drug therapy, under his license as an osteopathic physician and surgeon as defined by section 65-1201, G. S. 1935, and states that at all times mentioned in said petition he has treated patients both medically and surgically as taught and practiced in legally incorporated colleges of osteopathy of good repute.

"Defendant states that he is a graduate of the American School of Osteopathy of Kirksville, Mo. (now known as the Kirksville College of Osteopathy and Surgery), of the year 1915 and that all the time he attended said college, which included the year 1913, the use of medicine and surgery, including drug therapy, for the treatment and alleviation of human ills were taught and practiced in said college; that the osteopathic school or system of medicine and healing contemplates, comprehends and includes the practice of medicine and surgery, including drug therapy, and that colleges of osteopathy use the same textbooks on the practice of medicine and surgery that are used in approved schools of medicine generally, such as allopathic and homeopathic schools of medicine, and devote sufficient time to these subjects to thoroughly qualify their graduates in the use and practice of medicine and surgery; that the charter of said American School of Osteopathy (now known as the Kirksville College of Osteopathy and Surgery) specifically provided for the teaching

of surgery, obstetrics, such sciences and arts as are usually taught in medical colleges, and the treatment of diseases generally, including the use of drugs.

"Defendant admits that he operates a hospital in the city of Larned, Pawnee county, Kansas, and that he permits and authorizes other licensed osteopathic physicians and surgeons to use said hospital, but states that divers and numerous patients which have received, and are now receiving, medical and surgical treatment for the ills of said patients for a fee have been and are now being treated, both medically and surgically, according to the latest and best-known methods and systems of medicine and surgery taught and practiced in legally incorporated colleges of osteopathy of good repute.

"Defendant specifically denies that by his license he is only authorized, empowered and privileged to engage in the practice of osteopathy as was taught in legally incorporated colleges of osteopathy of good repute in the year 1913, pursuant to section 65-1201, G. S. 1935, as alleged in said paragraph 4, and for further answer alleges that on the contrary section 65-1201, G. S. 1935, authorizes and empowers defendant to practice medicine and surgery, including drug therapy, according to the latest and best-known methods as now taught in legally incorporated colleges of osteopathy of good repute; that the system, method and science of osteopathy is progressive, and that defendant possesses the educational and professional qualifications, by study and by experience, to exercise the requisite degree of care, skill and diligence in the treatment of his patients, as is required of practitioners of medical science; that by reason of his certificate to practice osteopathy, issued by the state board of osteopathic examination and registration, defendant is authorized, empowered and licensed to practice osteopathy and surgery as taught and practiced in legally incorporated colleges of osteopathy of good repute and that his certificate of authorization to so practice is conclusive evidence of his qualification and ability to practice and cannot be collaterally attacked in this proceeding, but can only be questioned and investigated in a proceeding to revoke said certificate and license."

The reply is a general denial.

The determination of the questions submitted, insofar as they are questions of law as distinct from questions of fact, and insofar as they are material to the issues formed by the pleadings, requires an examination of our statutes pertinent to the issue. It has been uniformly held in this state (*State v. Creditor*, 44 Kan. 565, 24 Pac. 346; *State v. Wilcox*, 64 Kan. 789, 63 Pac. 634; *Meffert v. Medical Board*, 66 Kan. 710, 72 Pac. 247; *State v. Johnson*, 84 Kan. 411, 114 Pac. 390; *State, ex rel., v. Cooper*, 147 Kan. 710, 716, 78 P. 2d 884), and generally elsewhere (48 C. J. 1068; 21 R. C. L. 352, 353), that in the exercise of its police power, and for the welfare and protection of its citizens, a state may enact statutes fixing educational and other reasonable and proper qualifications for those who, for a compensation, engage in the healing of the sick, afflicted, or injured, and require such persons, before engaging in such practice, to pro-

cure a certificate evidencing the fact they have attained such qualifications, and authorizing them to practice the art or profession of healing in harmony with established standards of their respective qualifications, as indicated by such certificate. The authority of the state to enact such statutes is conceded in this action.

We need not review such statutes as we had on this subject prior to 1901, for they were repealed in that year, and a much more comprehensive statute pertaining to the subject was enacted. (Laws 1901, ch. 254.) This was an act "to create a state board of medical registration and examination, and to regulate the practice of medicine, surgery and osteopathy in the state. . . ."

Section 1 of the act provided for the creation and prescribed the general duties of a state board of medical registration and examination, composed of seven members, "who shall be physicians in good standing in their profession, and who shall have received the degree of doctor of medicine from some reputable medical college or university." (This, as amended by Laws 1933, ch. 276, § 6, is G. S. 1935, 74-1001.)

Section 2 related to those then engaged "in the practice of medicine" in the state, and upon their application within a stated time, and upon a designated showing of their qualifications, authorized the board of medical registration and examination to issue to them certificates, which "shall be conclusive evidence that its owner is entitled to practice medicine and surgery in this state." (Now included by reference in G. S. 1935, 65-1002.)

Section 3 pertained to "all persons intending to practice medicine, surgery or osteopathy," and who had not complied with section 2, and required them to make application to the board of medical registration and examination, and to "submit to an examination of a character to test their qualifications as practitioners of medicine or surgery, and which shall embrace all those topics and subjects a knowledge of which is generally required by reputable medical colleges of the United States for the degree of doctor of medicine." This section contained the provision "that any graduate of a legally chartered school of osteopathy, . . . shall be given a certificate of license to practice osteopathy upon the presentation of such diploma." There were provisions for the issuance of temporary certificates. (This, as since amended, is G. S. 1935, 65-1001.)

Section 4 authorized the board of medical registration and examination to issue certificates "to practice medicine and surgery or

osteopathy within this state." Such certificates were to be recorded in the office of the county clerk where the holder resided and practiced. (This, as since amended, is G. S. 1935, 65-1003.)

Section 5 pertained to the financial matters of the board of medical registration and examination. (This, as since amended, is G. S. 1935, 65-1004.)

Section 6, so far as here pertinent, reads:

"Any person shall be regarded as practicing medicine and surgery within the meaning of this act who shall prescribe, or who shall recommend for a fee, for like use, any drug or medicine, or perform any surgical operation of whatever nature for the cure or relief of any wounds, fracture, or bodily injury, infirmity or disease of another person, or who shall use the words or letters 'Dr.,' 'doctor,' 'M. D.,' or any other title in connection with his name which in any way represents him as engaged in the practice of medicine and surgery; but nothing in this act shall be construed as interfering with any religious beliefs in the treatment of disease, provided that quarantine regulations relating to contagious diseases are not infringed upon. All persons who practice osteopathy shall be registered and licensed as doctors of osteopathy, as hereinbefore provided, but they shall not administer drugs or medicines of any kind nor perform operations in surgery. This act shall not apply to any commissioned medical officer of the United States army, navy, or marine service, in the discharge of his official duties; nor to any legally qualified dentist, when engaged in the legitimate practice of his profession; nor to any physician or surgeon who is called from another state or territory in consultation with a licensed physician of this state, or to treat a particular case in conjunction with a licensed practitioner of the state, and who does not otherwise practice in the state. Nor shall anything in this act apply to the administration of domestic medicines nor to prohibit gratuitous services; provided, any person holding a diploma issued by an optical college, and who has studied the anatomy of the eye and contiguous parts, human physiology and natural philosophy for at least six months under a competent teacher, and who shall pass examination satisfactory to the state board of medical registration and examination, shall be eligible to register as an optician or doctor of optics, and shall be otherwise governed by this act so far as the same is applicable." (This, as amended, is G. S. 1935, 65-1005.)

Section 7 prescribed penalties for any person "who shall practice medicine and surgery or osteopathy in the state of Kansas without having received and had recorded a certificate under the provisions of this act," or for violating other provisions of the act; and section 8 made it perjury for one falsely to swear or give testimony to procure such a certificate. (These, as since amended, are G. S. 1935, 65-1006, 65-1007.)

With slight amendments, not here important, this act remained in force until 1913, when chapter 290 of the Laws of 1913 was enacted. This was an act "concerning the practice of osteopathy, creating a

state board of osteopathic examination and registration," providing penalties for its violation, and amending and repealing sections 3, 4, 5, 6 and 7 of chapter 254 of the Laws of 1901. The first seven sections of this act relate to osteopaths and the practice of osteopathy. Section 1 provided for the creation of "a state board of osteopathic examination and registration consisting of five members . . . who are reputable practitioners of osteopathy, and who are graduates of a reputable school or college of osteopathy, . . . who shall have been in active practice in the state of Kansas for at least three years," and its general duties were outlined. (This is G. S. 1935, 74-1201.)

Section 2 required "any person not now a registered osteopathic physician of this state," before engaging in the practice of osteopathy in this state, to make application to "the board of osteopathic examination and registration," and to make a designated showing, or pass an examination. It required the board to "subject all applicants to a practical examination, as to their qualifications for the practice of osteopathy, in writing, in the subjects of anatomy, physiology, physiological chemistry and toxicology, pathology, diagnosis, hygiene, obstetrics and gynecology, surgery, principles and practice of osteopathy, and such other subjects as the board may require." The board was authorized to issue to a successful applicant "a certificate granting him the right to practice osteopathy in the state of Kansas, as taught and practiced in the legally incorporated colleges of osteopathy of good repute." Examination could be dispensed with in certain instances, and there was a provision for temporary certificates. (This is G. S. 1935, 65-1201.)

Section 3 defined "osteopathic school or college of good repute," as used in the act, to include "only such schools or colleges of osteopathy as are legally incorporated, and which prescribe a course of study covering the time provided for under the provisions of this act, and which shall instruct in all the branches of study in which examinations are required for license under the provisions of this act, . . . and the requirements of which shall be in no particular less than those prescribed by the American Osteopathic Association." (This is G. S. 1935, 65-1202.)

Section 4 pertained to the financial affairs of the board of osteopathic examination and registration. (This is G. S. 1935, 65-1203.) Section 5 required osteopathic physicians to observe all state and municipal regulations for the control of contagious diseases, report-

ing births and deaths, and all matters pertaining to the public health, "the same as all schools of medicine." (This is G. S. 1935, 65-1204.) Section 6 provided for the recording of the certificate in the office of the county clerk. (This is G. S. 1935, 65-1205.) Section 7 prescribed penalties for any person who in any way would use or attempt to use "the science or system of osteopathy in treating diseases of the human body" by fraud or misrepresentation, or otherwise violating, or failing to comply with, the provisions of the act. (This is G. S. 1935, 65-1206.)

The remaining sections of the act (Laws 1913, ch. 290), 8 to 14, amended and repealed sections 3, 4, 5, 6 and 7 of chapter 254 of the Laws of 1901. While some other changes were made in the sections, the principal one was to remove from them all provisions of the act pertaining to the examination of osteopaths, and the authority of the state board of medical registration and examination to issue certificates to practice osteopathy. The statutes will be referred to further, when necessary, in the discussion of the specific questions submitted.

Since the enactment of these two statutes (Laws 1901, ch. 254, and Laws 1913, ch. 290), we have had two boards, composed of persons having different educational qualifications, issuing different types of certificates: (1) The board of medical registration and examination, composed of seven members, "who shall have received the degree of doctor of medicine from some reputable medical college or university." This board is authorized to issue certificates "to practice medicine and surgery" in this state. (2) The board of osteopathic registration and examination, composed of five members, reputable practitioners of osteopathy, graduates of a reputable school or college of osteopathy. This board is authorized to issue certificates "to practice osteopathy" in this state. By these statutes, and subsequent amendments thereof, the legislature has clearly recognized a distinct difference between the "practice of medicine and surgery" and the "practice of osteopathy."

Also, in 1913, the legislature enacted a statute (Laws 1913, ch. 291) creating a board (G. S. 1935, 74-1301 to 74-1306) and authorizing it to issue a certificate to chiropractors (G. S. 1935, 65-1301 to 65-1311). Similar boards have been created and authorized to issue appropriate certificates to trained nurses (G. S. 1935, 74-1101 to 74-1105; 65-1101 to 65-1110); to dentists (G. S. 1935, 74-1401 to 74-1403; 65-1401 to 65-1415); to optometrists (G. S. 1935, 74-1501

to 74-1504; 65-1501 to 65-1513) ; to pharmacists (G. S. 1935, 74-1601 to 74-1602; 65-1601 to 65-1623) ; to embalmers and funeral directors (G. S. 1935, 74-1701 to 74-1705; 65-1701 to 65-1726) ; to barbers (G. S. 1935, 74-1801 to 74-1804; 65-1801 to 65-1807) ; to cosmetologists (G. S. 1935, 74-2701 to 74-2705; 65-1901 to 65-1910) ; to podiatrists (G. S. 1935, 74-2801 to 74-2804; 65-2001 to 65-2008). Each of these professions has its standards of educational and professional requirements. Unless a statute specifically authorizes it, the holder of one of these certificates is not authorized to engage in the practice of any of the other of the professions for which another certificate is required.

We shall now take up and determine the specific legal questions propounded by defendant, although perhaps some of them do not have a direct bearing upon the issues raised by the pleadings.

1. (a) Is the osteopathic statute prospective in operation, or (b) are osteopathic physicians limited to the state of the science and art as taught and practiced in 1913, when the statute was enacted? Answering the first part of this question, (a) the statute was prospective in operation; that is to say, it was designed to operate in the future. After the enactment of our first statute, recognizing osteopathy as a system or school of thought and practice for the treatment of the sick, injured, or afflicted, no one could practice osteopathy lawfully in this state unless he held a certificate authorizing him to practice osteopathy issued by the state board authorized by statute to issue such certificates. From 1901 to 1913 this was the state board of medical registration and examination. Since 1913 it has been the state board of osteopathic registration and examination. The statute did not operate retrospectively so as to punish those who had practiced osteopathy previous to the effective date of the statute. (b) Osteopathic physicians, meaning by that term those to whom certificates have been issued authorizing them to practice osteopathy in this state by a state board authorized to issue such certificates, are limited to the practice of osteopathy in harmony with the fundamental principles of osteopathy, or what is sometimes spoken of as the science or system of osteopathy (G. S. 1935, 65-1206), as generally known and understood and as taught in osteopathic schools or colleges of good repute in 1901 and 1913. Osteopaths, in common with all scientific and professional men, are expected to continue to study, to make progress, to learn more about their profession, and to apply such knowledge in their practice, but

they are still engaged in the practice of osteopathy, as that science or system was known and understood when our statutes above mentioned were enacted. They are not authorized to practice optometry (*State, ex rel., v. Eustace,* 117 Kan. 746, 233 Pac. 109), or any of the other professions which require a specific certificate of authority. If, as suggested by counsel for defendant, osteopathy has abandoned its fundamental opposition to drug therapy and operative surgery (meaning by this term surgery by the use of surgical instruments), and now includes the use of those things in its system, that fact never has been recognized by the legislature of this state. Our statutes continue to recognize the "practice of osteopathy" and the "practice of medicine and surgery" as separate and distinct things. A certificate authorizing one to practice osteopathy, whether issued prior to 1913 by the board of medical registration and examination, or since that time by the board of osteopathic registration and examination, never has been recognized by our statutes, nor by our courts, as authorizing its holder to engage in the "practice of medicine and surgery" in this state.

2. What judicial construction should be put upon the words "anatomy, physiology, physiological chemistry and toxicology, pathology, diagnosis, hygiene, obstetrics and gynecology, surgery, principles and practices of osteopathy" as used in the osteopathic statute? (G. S. 1935, 65-1201.) This is simply a list of subjects in which an applicant for a certificate to practice osteopathy is required to take an examination. An osteopathic school or college of good repute is required to teach these subjects. (G. S. 1935, 65-1202.) However, the certificate issued to a successful applicant is a certificate "to practice osteopathy." Defendant stresses the word "surgery" in this list and argues that surgery, as used in the osteopathic statute, means the same as it does in any other statute, and hence that a certificate to practice osteopathy authorizes its holder to practice surgery in any and all of its aspects and operations. This contention is too broad. The word is difficult to define (Bouvier's Law Dict., 3d Rev.). It comes from two Greek words signifying *the hand* and *work* (id.). Originally it was part of the profession of barbers, but later was taken up by physicians and now is recognized as that "branch of medical science, and more specifically that branch of medical science which treats of mechanical or operative measures for healing diseases, deformities, or injuries." (48 C. J. 1065.) Counsel for defendant call our attention to the fact that the phrase that those

licensed to practice osteopathy "shall not administer drugs or medicines of any kind nor perform operations in surgery," contained in our 1901 statute (Laws 1901, ch. 254, § 6), was omitted in the 1913 statute (Laws 1913, ch. 290). That this was done intentionally, they say, is evidenced by the fact that in the chiropractic act, passed at the same session of the legislature (Laws 1913, ch. 291), a similar phrase was used with respect to chiropractors (G. S. 1935, 65-1303, clause [c]). They argue that the intentional removal of this restriction on osteopaths contained in the 1901 statute indicates a legislative intent to authorize osteopaths to administer drugs and perform operations in surgery without restriction. It seems clear the legislature intentionally omitted the prohibitory phrase contained in the 1901 act from the act of 1913 (ch. 290), but it does not follow that thereby the legislature intended to confer unrestricted authority on osteopaths to administer drugs and perform operations in surgery. Considering the fact that surgery in its primitive and broadest sense includes adjustment of bones, muscles, ligaments and nerves by manual operation, and that skill in doing so is taught in osteopathic schools and colleges, and occupies a major place in the science or system of osteopathy, and in the practice of osteopathy, the prohibition against osteopaths performing operations in surgery contained in the 1901 act was, at its best, an inaccurately used expression, and should have been omitted for that reason alone. The science or system of osteopathy, generally speaking, strongly opposed the use of drugs as remedial agencies in treating the sick, afflicted, or injured, and osteopathic schools and colleges of good repute contained no course for the study of materia medica; hence, there was no real occasion to prohibit osteopaths from using drugs, since they made no claim or pretense of doing so, nor did they study to qualify themselves for such use. Broadly speaking, theirs was a drugless system of healing. Surgery, as well as obstetrics (*Yard v. Gibbons*, 95 Kan. 802, 149 Pac. 422), and each of the other subjects in which osteopaths were required to take an examination, were taught in the osteopathic schools and colleges of good repute, in harmony with the osteopathic theory or system of healing, and not as taught in the medical colleges and universities. So the word "surgery," as used in this statute, meant, in the main, surgery by manual manipulation. The general use of a knife or other instruments in surgical operations was regarded as unnecessary and opposed to the osteopathic system of treatment. Apparently the legislative intent of the act of 1913

(ch. 290) was to recognize the system of osteopathy as then taught in its schools and colleges of good repute, and to authorize its practice by those who believed in and conformed to its teachings. Our legislature recognized that there is a broad field for the use of such a system of the healing art. If, as is suggested by counsel for defendant, osteopathic schools and colleges of good repute, and those who practice osteopathy, have abandoned their fundamental theory that surgery, in the main, should be confined to manipulation without the use of the knife and other instruments, that fact never has been recognized by the legislature or the courts of this state.

3. What judicial interpretation should be put on the phrase "as taught and practiced in the legally incorporated colleges of osteopathy of good repute" as used in the osteopathic statute? (G. S. 1935, 65-1201.) Such schools and colleges are defined in G. S. 1935, 65-1202. What was taught in them in 1913 was a matter of common knowledge. Their courses of study were available, as were the writings of its founder, and other leading osteopathic teachers and practitioners. Osteopathy, or the science or system of osteopathy, could be as readily designated by the language used in the statute as in any other way. If there is any substantial controversy on this point, the controversy is one of fact rather than one of law.

4. Does the osteopathic practice act define osteopathy? In *State, ex rel., v. Eustace,* 117 Kan. 746, 233 Pac. 109, it was said in the opinion (p. 747), "osteopathy is not defined in the statute." It is true it is not categorically defined, but for the purposes of the act it is sufficiently defined by reference to osteopathy as taught and practiced in the legally incorporated colleges of osteopathy of good repute.

5. If the osteopathic practice act fails to define osteopathy, is it void for uncertainty? The statute is not void for uncertainty in its failure more specifically to define osteopathy.

6. Does the osteopathic practice act delegate to the legally incorporated colleges of osteopathy the right to determine standards and scope of practice of osteopathy in Kansas? Yes, within the limits prescribed by statute (G. S. 1935, 65-1202), but this does not authorize the state board of osteopathic registration and examination to approve schools or colleges which do not conform their teachings to the fundamental principles of osteopathy.

7. If the osteopathic practice act does so delegate, is it void as an unconstitutional delegation of legislative power? The statute is

not void on the ground of unconstitutional delegation of legislative power.

8. Are osteopathic physicians in Kansas licensed (a) to administer drugs and narcotics and practice drug therapy, and are they licensed (b) to perform surgery under the provisions of the osteopathic practice act? Generally speaking, the answer to the first part of this question (a) must be in the negative, insofar as such drugs are given as remedial aids. To the second part of the question (b) the answer must be "yes," if confined to surgery as the same was taught and used as a part of the osteopathic system of healing—which, in the main, was by manipulation—and the answer should be "no," if it extends beyond this into the general field of operative surgery with surgical instruments. In this connection the briefs put to us specific questions, such as: May one licensed to practice osteopathy, under stated circumstances, administer a simple drug, or a specific drug, for remedial purposes, or use surgical instruments? We are not called upon to answer detailed questions of that character, nor would we deem it proper for us to do so. We are called upon to interpret our statutes. We have no difficulty in finding that our legislature recognized the practice of medicine and surgery as one thing, and the practice of osteopathy as another, and that it regarded both schools of healing as having merit, and the practice of each was authorized. Although founded on different basic ideas, they seek to attain the same objective—namely, the curing or reducing of injurious effects of diseases or injuries to mankind. The legislative purpose was to protect citizens of the state from those who would attempt to accomplish such purposes by means which they had not studied, or were otherwise unqualified to use. As in other schools of thought having a common object in view, such as religion or political science, while fundamental differences exist, there may be ideas or practices in common. Professional men of high standing seldom have serious difficulty with such details. Our legislature dealt with the two schools of healing in terms quite general, and that is the viewpoint we take. It is possible the classification made by the legislature is sufficiently definite that the detailed specific questions presented in the briefs, and others of a similar character, can be answered, but if so, they partake more of questions of fact than of pure questions of law.

9. What judicial interpretation should be put on the phrase, "This act shall not apply to any registered osteopathic physician or

any chiropractic practitioners of the state of Kansas, or any commissioned medical officer of the United States army, navy or marine service in the discharge of his official duties; nor to any legally qualified dentist, when engaged in the legitimate practice of his profession"; as used in the medical practice act?   (G. S. 1935, 65-1005.)   Earlier in this opinion we quoted in full section 6 of chapter 254 of the Laws of 1901, in the latter part of which is a statement as to whom the act did not apply.   When that section was amended in 1913 (Laws 1913, ch. 290, § 10, now G. S. 1935, 65-1005), the language quoted in this question was used.   As applied to osteopaths, we think it meant no more than that one who desired to practice osteopathy should not be required to make application to the state board of medical registration and examination and have that board pass upon his qualifications and issue to him a certificate to practice osteopathy.   Counsel for defendant contend that the language used must be taken in its full literal sense, and by so construing it the legislature meant to say, and in fact did say, that none of the provisions of the medical practice act (now G. S. 1935, 65-1001 to 65-1008) applies to osteopaths; hence, that osteopaths may "practice medicine and surgery" in all particulars with impunity. This contention cannot be sustained.   It would render ludicrous and nugatory the work of the legislature in treating the practice of medicine and surgery as one thing and the practice of osteopathy as another, and in establishing two state boards, one of medical registration and examination and the other of osteopathic registration and examination, each authorized to issue certificates to practice for the respectively different purposes.   Defendant argues that in the interpretation of statutes all the language used in the statute should be given full force and effect.   That may be stated as a general rule, but a more important rule is that in determining the legislative intent in enacting a statute the general purpose of the legislature, as shown by the statute as a whole, is of primary importance. Words, phrases and figures used in the statute should be construed in harmony with that general purpose.   If, standing alone, a phrase will render that general purpose nugatory, it should be disregarded, if need be, in order to give purpose to the legislative enactment.   In the late case of *Marlin v. Cardillo*, 95 F. 2d 112, it was said (p. 115) "it is a well-settled rule of construction that the letter of a statute will not be followed when it leads to an absurd conclusion or a meaningless result.   (*Nautzel v. Ryans*, 184 Ky. 292, 211 S. W. 852;

*Coney v. City of Topeka,* 96 Kan. 46, 149 Pac. 689; *Tatlow v. Bacon,* 101 Kan. 26, 165 Pac. 835, 14 A. L. R. 269; *Anderson v. Town of Friendly,* 86 W. Va. 554, 104 S. E. 48. See, also, *Sinclair v. United States,* 279 U. S. 263, 296, 49 S. Ct. 268, 272, 73 L. Ed. 692.)" Many other authorities to the same effect may be found in the General Digest, under *Statutes,* key number 183.

10. Does the petition state a cause of action for violation of the medical practice act, or for a violation of the osteopathic practice act? It is difficult to see the purpose of this question. From a reading of the petition it seems clear that defendant is charged with doing all the things he could do if he had the certificate to practice medicine and surgery; that he has no such certificate, and that the only certificate he has is one to practice osteopathy.

11. Can the right of defendant to practice in Kansas be attacked collaterally, as in this action, or is the proper action one to revoke his license for exceeding the powers granted thereunder? This question assumes that the attack here is a collateral one. The assumption is erroneous. It is a direct attack by the state, on the relation of the attorney general, in an action specifically authorized by chapter 270 of the Laws of 1937. We do not have before us the question whether defendant's certificate to practice osteopathy might be revoked because of the facts alleged in the petition; hence, we express no view on that question.

Having answered the questions propounded by defendant, we await suggestions of counsel as to what further orders should be made or proceedings had in this action.