280

GLEASON et al. v. CARLSON, Governor, et al.

Civ. No. 3252.

United States District Court
D. Kansas, Second Division.

Dec. 9, 1948.

NeSmith & Irwin, Wichita, Kan., E. H. Hatcher, Topeka, Kan., for plaintiffs.

Edward F. Arn, Attorney General, Blake A. Williamson, Kansas City, Kan., Dale & Hickman, Arkansas City, Kan., for defendants.

Before PHILLIPS, Chief Judge, and HUXMAN, Circuit Judge.

HUXMAN, Circuit Judge.

I desire to set out the grounds on which I concur in the judgment of the court.

This is an action under Section 266 of the Judicial Code, 28 U.S.C.A. § 380, now 28 U.S.C.A. § 2281, to enjoin defendants, the Governor and Attorney General of the State of Kansas, from the enforcement of the restrictions contained in Sections 65-1201 and 65-1005, Kansas Statutes 1935, in so far as they apply to plaintiffs. Plaintiffs are licensed osteopaths under the laws of Kansas and bring this action for themselves and in behalf of all osteopathic physicians in Kansas. It is their claim that the above sections of the Kansas Statutes, as interpreted by the Kansas Supreme Court, are void and in violation of Section 1 of the 14th Amendment to the Constitution of the United States for the reason that plaintiffs are prohibited from using drugs and operative surgery in their practice of osteopathy notwithstanding that they are required to study and qualify themselves in the use of drugs and the practice of surgery. This, they claim, deprives them of liberty and property without due process of law.

While it is not directly so stated in the Kansas Statutes, the Kansas Supreme Court has declared on several occasions and interpreted the applicable statutes to mean that persons licensed to practice medicine and surgery may use drugs and operative surgery, while those licensed to practice osteopathy are prohibited from practicing medicine and surgery. Under this construction, certain of the plaintiffs have been enjoined by the Kansas Court from the use of drugs and operative surgery. Plaintiffs, both by evidence and argument, point to their educational qualifications, to the standards of osteopathic colleges generally, the training received by osteopaths in comparison to that of doctors of medicine and surgery and the scope of the examination

given osteopaths by the State Osteopathic Board. Generally plaintiffs assert that they study the use of drugs and the performance of surgery in their schools to the same extent that medical students do in medical schools and that upon graduation they are qualified in these branches of the healing art to the same extent as are graduates from medical schools. They, therefore, contend that the restrictions placed upon them by the Kansas Statutes and decisions of its courts are unreasonable, arbitrary, detrimental to the public health, an unreasonable exercise of the police power, discriminatory, and in violation of Section 1 of the 14th Amendment.

In our Findings, we have found that as of 1913, the course of study in osteopathic schools did not include a study of materia medica and pharmacology, but that in other respects the course of study in osteopathic schools with regard to the use of drugs and performance of surgery was substantially the same as that in medical schools, the pedagogy differing only in emphasis, intensity and degree.

As I view the problem, the decision does not turn upon whether the use of drugs and surgery was a part of the original osteopathic concept or was subsequently engrafted upon it, in order to make osteopathy a complete unit of the healing art. Nor does the decision turn upon whether the training in the use of drugs and surgery as taught in reputable osteopathic schools is or is not the equivalent of that taught in accredited medical schools. For the purpose of this opinion, I will, therefore, assume that the use of drugs and surgery was a part of the original osteopathic concept and that reputable osteopathic schools teach surgery and the use of drugs to the same extent that these subjects are taught in accredited medical schools.

The power of this court to strike down legislation by a state regulating the practice of the healing art, is a narrow one. It is well settled that the police power of the state extends to the regulation of certain trades and callings, particularly those which closely concern the public health.[1] Practitioners of the healing art are properly subject to police regulations, the details of which are primarily with the legislature and are not to be interfered with by federal courts so long as fundamental, constitutional rights are not violated.[2] Equal protection of the laws does not preclude states from resorting to classification for various purposes of legislation.[3] The legislature has the power to classify, and narrow distinctions will justify classification in legislation if they are reasonably related to the objects of legislation.[4]

In pursuance of this power, Kansas has seen fit to differentiate between the treatment of human ills through the use of drugs and surgery and the treatment of such ills by means of manipulative therapy. In regulating the practice of the two branches of the healing art, different educational requirements are made for each. The examinations given to applicants of each class are distinguishable under the pertinent statutes designed to insure qualified, licensed practitioners in each of the two fields. The statute regulating the examination of medical doctors, Section 65-1001, Kansas Statutes, 1947 Supplement, provides in part, as follows: "All persons intending to practice medicine or surgery after the passage of this act * * * shall apply to said board (Board of Medical Registration and Examination) at any regular meeting, or at any other time or place as may be designated by the board for a license. Application shall be made in writing and shall be accompanied by the fee hereinafter specified, together with the age and residence of the applicant, proof that he is of good moral character and satisfactory evidence that he has devoted not less than * * * four periods of not less than six months each * * * to the study of medicine and surgery. All such applicants, except as here-

---

1. Watson v. Maryland, 218 U.S. 173, 30 S. Ct. 644, 54 L.Ed. 987.

2. Polhemus v. American Medical Ass'n, 10 Cir., 145 F.2d 357.

3. H. P. Welch Co. v. New Hampshire, 306 U.S. 79, 59 S.Ct. 438, 83 L.Ed. 500.

4. New York Rapid Transit Corp. v. City of New York, 303 U.S. 573, 58 S.Ct. 721, 82 L.Ed. 1024.

inafter provided, shall submit to an examination of a character to test their qualifications as practitioners of medicine or surgery, and which shall embrace all those topics and subjects a knowledge of which is generally required by reputable medical colleges of the United States for the degree of doctor of medicine * * *."

These are the only statutory educational requirements for the practice of medicine and surgery. However, pursuant to Section 74-1001, Kansas Statutes 1935, which provides that the Medical Board shall formulate rules to govern its procedure, the Kansas Court in Jones v. Kansas State Board of Medical Registration and Examination, 111 Kan. 813, 208 P. 639, held that this provision gave authority for the Board to make rules and regulations increasing the statutory qualifications. The present rule of the Board is as follows: "General Qualifications. The applicant must meet the following requirements: 1. A citizen of the United States. 2. Possessed of good moral character, willing to abide by the principles of medical ethics adopted by the American Medical Association. 3. Possessed of the minimum preliminary educational qualifications following: (a) A graduate of a four-year high school course. (b) All graduates subsequent to 1914 must have had at least two years attendance in a college of liberal arts. (c) A graduate of a reputable medical school. Reputable medical college shall be any medical college in the United States classed as an approved medical school by the American Medical Association. This board, however, reserves the right to add to or take from the accredited list of American Medical Association by a majority vote of the members of this board."

The statute regulating the practice of the osteopathic physician [5] provides in part as follows: "Any person not now a registered osteopathic physician of this state, before engaging in the practice of osteopathy in this state shall make application to the board of osteopathic examination and registration, on a form prescribed by the board, for a certificate to practice osteopathy, giving first his name and age, which shall not be less than twenty-one years, and residence; second, the name of the school or college of osteopathy from which he graduated, which shall have been in good repute as such, at the time of the issuing of his diploma, as determined by the board; third, the date of his diploma, evidence that such diploma was granted on personal attendance and completion of the course of study of not less than four terms of five months each, and such other information as the board may require, and sufficient evidence that the applicant is of good moral character. Such application shall be accompanied by a fee of twenty-five dollars. No holder of a diploma issued after June, 1907, shall be admitted to an examination, nor shall a certificate to practice osteopathy be otherwise granted by said board, to any such applicant unless said applicant shall have a diploma of graduation from high school, academy, state normal school, college or university, a certificate of examination for admission to the freshman class of a reputable literary or scientific college, approved by aforesaid board, as a preliminary education before taking up the study of osteopathy, and shall have graduated, after personal attendance, from an osteopathic school or college of good repute wherein the course of study shall consist of at least three years of nine months each, in three separate years, and after June [1], 1915, said applicant shall have a diploma of graduation from a high school, academy, state normal school, college or university, a certificate of examination for admission to the freshman class of a reputable literary or scientific college, approved by the aforesaid board, before taking up the study of osteopathy, and shall have graduated, after personal attendance from an osteopathic school or college of good repute wherein the course of study shall consist of at least four years of eight months each in each separate year * * *. The board shall subject all applicants to a practical examination, as to their qualifications for the practice of osteopathy, in writing, in the subjects of anatomy, physiology, physio-

5. Sections 65-1201, 65-1202, Kansas Statutes 1935.

logical chemistry and toxicology, pathology, diagnosis, hygiene, obstetrics and gynecology, surgery, principles and practice of osteopathy, and such other subjects as the board may require. This may be supplemented by other practical examinations such as the board may by rule determine. If such examination is passed in a manner satisfactory to the board, then the board shall issue to said applicant a certificate granting him the right to practice osteopathy in the state of Kansas, as taught and practiced in the legally incorporated colleges of osteopathy of good repute. * * *"

Section 65-1202, G.S.Kansas 1935, states: "Osteopathic school or college of good repute; defined. The words, 'osteopathic school or college of good repute,' wherever used in this act, shall be deemed and taken to include only such schools or colleges of osteopathy as are legally incorporated, and which prescribe a course of study covering the time provided for under the provisions of this act, and which shall instruct in all the branches of study in which examinations are required for license under the provisions of this act, and shall require the personal attendance of the student throughout. the course, and the requirements of which shall be in no particular less than those prescribed by the American Osteopathic Association. * * *"

It is clear from the Kansas Statutes that Kansas recognizes the practice of medicine and surgery as a branch of the healing art, separate and apart from that of osteopathy.[6] Two separate and distinct sets of regulations have been set up to control what Kansas considers to be two distinguishable branches of the healing art. Kansas has seen fit to set up one board to examine those who would practice surgery and the use of drugs and a separate board to examine those who would practice cure of disease by manipulation or osteopathic practices. It has set up the qualifications which applicants must meet who would take the examination before the medical board for the right to practice surgery and medicine, and the qualifications of applicants who would take the examination before the Osteopathic Board for the right to practice osteopathy. No one would seriously contend that it is arbitrary or unreasonable to compel one who seeks the right to perform surgery or administer drugs and medicines to be a graduate of an approved school or that he take the examination before a board composed of members qualified specially in such subjects, and that would be so even if plaintiffs are correct in their contention that the use of surgery and the administration of drugs always has been a part of the osteopathic concept.

In order then for plaintiffs to make a case entitling them to relief under the 14th Amendment, it is necessary for them to show that the osteopathic colleges from which they are graduates meet all the educational qualifications of the Kansas Statutes and of the rules adopted by the medical board, for those who would practice surgery and the use of drugs and medicine, that they are approved schools or that approval has been arbitrarily and unreasonably denied and that they have been denied the right to take the examination before the medical board. It is not contended that plaintiffs have met this burden nor is this the theory upon which they bring their case, but these elements are present and inherent in considering whether they have been denied the due process guaranteed by the 14th Amendment.

As pointed out, plaintiffs pitch their entire case on the proposition that surgery and the use of drugs have always been a part of the osteopathic concept and that graduating from osteopathic colleges, maintaining comparable courses of study with medical schools and passing the osteopathic board of examination is sufficient to entitle one to the practice of medicine and surgery. With this I cannot agree. It is still necessary that such schools be approved as provided by law and the appropriate regulations, and that graduates therefrom take the examination before the medical board. Of course, if approval were arbitrarily denied to a qualified osteopathic school and if

6. State ex rel. Beck v. Gleason, 148 Kan. 1, 79 P.2d 911; State ex rel. Wheat v. Moore, 154 Kan. 193, 117 P.2d 598.

its graduates were arbitrarily denied the right to take the examination before the medical board, a different question might arise, but such is not the case here. Statutory regulations requiring all applicants for the right to practice surgery and the administration of drugs and medicine to be graduates of approved schools and to take an examination before a medical board composed of members qualified in such subjects are not unreasonable or arbitrary and therefore do not contravene any rights provided by the 14th Amendment.

I am authorized by the Court to say that we do not pass on the question whether it is lawful for graduates from qualified osteopathic schools in Kansas to practice incidental surgery such as severing the umbilical cord or repairing lacerations by the use of surgery in obstetrical cases.

## Supplemental opinion

PHILLIPS, Chief Judge.

I desire to supplement what Judge HUXMAN has said, in order to more fully and more accurately reflect my views with respect to the issues presented.

In the opinion, the evidence clearly established these facts:

At the time of the adoption of Ch. 290, Laws of Kansas 1913, Sections 65-1201–65-1206, G.S.Kan.1935, and for at least a substantial number of years thereafter, osteopathy as taught and practiced in the legally incorporated colleges of osteopathy of good repute was a system of therapeutics based on the theory that diseases are due chiefly to structural derangement in the body; the practice of the science of osteopathy consisted in the detection of structural derangement and the restoration of structural integrity solely by manual manipulation, thus providing a healthy nerve and blood supply to the part involved and thereby allowing it to combat or cure the diseased condition; and the theory of osteopathy embraced the concepts that "Every living organism has within it the power to manufacture and prepare all chemicals, materials and forces needed to build and repair itself," and that "No material other than food and water taken in satisfaction of the demands of appetite * * * can be introduced from the outside without detriment," and "when every part" of the body "is adjusted and in perfect harmony" health will be maintained.[1]

Osteopathy wholly repudiates drug therapy and sanctions the use of drugs only as anesthetics, external antiseptics, antidotes for poison, and possibly as a palliative for pain.

Dictionaries and judicial decisions uniformly define osteopathy as a system of treating diseases of the human body by manual manipulation without the use of drugs or surgery.[2]

It is provided by a number of statutes and generally held by the courts that license to practice osteopathy does not give the holder the right to prescribe or administer drugs or perform surgery with instruments.[3] A person licensed to practice medicine and surgery in Kansas may not practice osteopathy without meeting the requirements for a license to practice osteopathy and obtaining such license.[4]

Osteopathy recognizes that surgery should be employed, when necessary, not as a part of the practice of osteopathy, but as a complement thereto. In the catalog of the American School of Osteopathy for 1918–1919, p. 50, the following statement appears: "Osteopathy is the physical or manual manipulation of the body structures, without instruments, * * * While surgery in a somewhat different way * * * handles the body structures physically and manually with instruments." Substantially the same statement is found in the catalogs

---

1. Twenty-First Annual Catalog, American School of Osteopathy, 1913 and 1914, pp. 10, 11.

2. State v. Baker, 229 N.C. 73, 48 S.E.2d 61, 65, and cases there cited; Burke v. Kansas State Osteopathic Ass'n, 10 Cir., 111 F.2d 250, 252, 253.

3. 41 Am.Jur., Sec. 26, p. 156; Note, 86 A. L.R. 626.

4. State v. Hopkins, 54 Mont. 52, 166 P. 304, 306, 307, Ann.Cas.1918D, 956; State v. Wood, 53 Mont. 566, 165 P. 592, 594.

of that school for the years 1913–1914, 1914–1915, and 1915–1916.

In the catalog of that school for 1918–1919, pp. 50, 52, it is stated that osteopathy has prevented many thousands of useless surgical operations; that osteopathy adjusts structures so that a healthy nerve and blood supply to the part involved allows it to combat or cure the diseased condition; but when in a limited number of cases, where, through trauma or other causes, the tissues have been so destroyed, diseased, or degenerated that restoration of a healthy nerve and blood supply cannot be accomplished through manual manipulation, that then resort should be had to surgery. It gives as examples, lacerations in childbirth, certain types of congenital deformities, and certain kinds of tumors. It states that "Surgery repairs cuts, removes tissues so badly diseased or degenerated that regeneration is impossible, and * * * complements the other part [osteopathy] of rational therapeutics." It plainly states that surgery is not a part of, but a complement to, osteopathy. Substantially the same statements are found in the earlier catalogs referred to above.

The above catalogs state, in substance, that the practice of osteopathy and major surgery should not be combined; that the school undertakes to prepare its students to do minor surgery only, to diagnose cases where major surgery should be resorted to, and to give after treatment in major surgery cases.

Such catalogs further state, in substance, that while the teaching of surgery has been broadened to meet the demands of patients, osteopathy would never countenance the use of drug therapy, except for the limited purposes stated above.

The catalogs of the Des Moines Still College of Osteopthy for 1917–1918, 1916–1917, and 1914–1915, in describing the course in surgery, plainly state that it does not undertake to prepare its students to do major surgery, but only to do minor surgery, and recognizes surgery as an adjunct to, and not a part of, osteopathy.

That such was the theory and the practice of osteopathy as taught in the incorporated colleges of osteopathy of good repute in the year 1913 and years prior and subsequent thereto was also proven by the testimony of persons who were students in such colleges in the year 1913 and years prior and subsequent thereto.

Thus, it will be seen that in the year 1913, there were fundamental differences in the osteopathic theory of therapeutics and the practice of osteopathy and the theory of therapeutics of medicine and surgery and the practice thereof.

█ It is established that the Equal Protection Clause of the Fourteenth Amendment permits classification for the purposes of legislation and the power to classify is of wide range and flexibility. However, the classification must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation so that all persons similarly circumstanced will be treated alike.[5]

It seems clear to me that the fundamental differences adverted to above fully justified the state in placing the practice of osteopathy in one classification and the practice of medicine and surgery in another classification, in establishing different educational requirements and providing different examinational tests for osteopaths, and in restricting osteopaths to the practice of osteopathy, in order to preserve the public health and welfare.

It may be, that the curricula of the schools of osteopathy have either been broadened or varied since 1913 so as to teach a limited use of drug therapy and so as to better prepare their students for the doing of surgery as a complement to the practice of osteopathy. But, in 1913 the osteopathic colleges did not teach drug therapy and did not adequately prepare their students to practice major surgery and recognized surgery not as a part of, but as a mere complement to, osteopathy. That being true, Kansas was justified in restricting the licensed osteopath to the

5. Colgate v. Harvey, 296 U.S. 404, 422, 423, 56 S.Ct. 252, 80 L.Ed. 299, 102 A.L.R. 54.

practice of osteopathy and in prohibiting him from prescribing or administering drugs and, subject to the qualifications stated in the last paragraph of Judge Huxman's opinion, from doing surgery with instruments, since such restriction and prohibitions had a real and substantial relation to the object sought, the preservation of the public health and welfare. Moreover, by employing the phrase "osteopathy * * * as taught and practiced in the legally incorporated colleges of osteopathy of good repute," the legislature of Kansas did not set the signification of osteopathy at large so as to permit the osteopathic colleges to give it any meaning they should choose. Osteopathy was a system of treating diseases of the human body without drugs or surgery and the legislature merely authorized the college to determine, select, and teach the most desirable methods of doing what is comprehended within the term osteopathy. Colleges could not change the laws of Kansas or widen the scope of the osteopath's certificate so as to permit him to practice other systems of healing by the simple expedient of varying their curricula.[6]

Counsel for plaintiffs urge, however, that in 1913 the legally incorporated and reputable schools of osteopathy taught surgery and that, in order to obtain a license to practice osteopathy in Kansas, it was necessary for the applicant to graduate from one of such schools and pass an examination in the subjects enumerated in the statute or required by the osteopathic board, including the subject of surgery. In my opinion, such a requirement is not unreasonable. The osteopathic colleges recognized that in a limited number of cases where tissues had become so badly diseased, degenerated, or destroyed, that regeneration was not possible through manipulative treatment, surgery should be resorted to as a complement to osteopathy, and they undertook to train their students so they would be able to diagnose and advise major surgery, where resort thereto was necessary as a complement to osteopathy. If that fact, recognized by the osteopathic colleges, is true, the necessity of the osteopath having sufficient surgical training to enable him to diagnose and determine cases where surgery should be resorted to as a necessary complement to osteopathy and advise surgery in such cases is obvious. Therefore, it was not unreasonable in 1913 to require applicants for a license to practice osteopathy to graduate from such schools and to pass an examination in the subject of surgery. As stated by the court in Georgia Ass'n of Osteopathic Physicians and Surgeons v. Allen, D.C.Ga., 31 F.Supp. 206, 213, "His knowledge must be broader than his practice; he must know what he practices, but he may not practice all he knows."

If an osteopath in Kansas desires to engage in the practice of medicine and surgery, he must meet the requirements laid down for a license so to do. These requirements are attainable by reasonable study and application, are appropriate to the end sought to be attained, and are neither unreasonable nor arbitrary.[7]

If the osteopathic colleges desire to broaden or vary their curricula so as to train their students not only to practice osteopathy, but also medicine and surgery, in Kansas, then with respect to the latter they must meet the requirements to constitute them approved medical schools. I repeat, they cannot broaden the license to practice osteopathy in Kansas by the simple expedient of varying or expanding their curricula.

█ With the wisdom or expediency of the statutory requirements here involved, we are not concerned. Our sole function

---

6. State v. Baker, 229 N.C. 73, 48 S.E.2d 61, 65; State ex rel. Johnson v. Wagner, 139 Neb. 471, 297 N.W. 906, 910, 911; Georgia Ass'n of Osteopathic Physicians and Surgeons v. Allen, D.C.Ga., 31 F.Supp. 206, 213; State v. Bonham, 93 Wash. 489, 161 P. 377, 381, L.R.A.1917D, 996.

7. Dent v. West Virginia, 129 U.S. 114, 9 S.Ct. 231, 32 L.Ed. 623; State v. Hopkins, 54 Mont. 52, 166 P. 304, 307, Ann. Cas.1918D, 956; People v. Witte, 315 Ill. 282, 146 N.E. 178, 37 A.L.R. 672.

is to determine whether they deny the equal protection of the laws in violation of the Fourteenth Amendment. It is my conclusion that the statute, as construed by the Supreme Court of Kansas, is valid.