**BURKE, Collector of Internal Revenue, v. KANSAS STATE OSTEOPATHIC ASSOCIATION, Inc., et al.**

No. 1989.

Circuit Court of Appeals, Tenth Circuit.

April 5, 1940.

Rehearing Denied May 11, 1940.

Summerfield S. Alexander, of Topeka, Kan. (Homer Davis, of Topeka, Kan., on the brief), for appellant.

E. H. Hatcher, of Topeka, Kan. (James E. Smith, of Topeka, Kan., on the brief), for appellees.

Before BRATTON, Circuit Judge, and VAUGHT and MURRAH, District Judges.

VAUGHT, District Judge.

This is a suit instituted by The Kansas State Osteopathic Association, Incorporated, the members of the Board of Trustees of such association, and certain duly licensed and practicing osteopathic physicians in the State of Kansas, against the Collector of Internal Revenue in that state, to enjoin the collector from refusing to issue and reissue narcotic licenses to osteopathic physicians within the state, and to direct and command him to issue and reissue them upon their expiration, and to issue proper permits and stamps to procure narcotic drugs for use by such osteopathic physicians in the practice of their profession, as provided by the laws of the United States and of the State of Kansas. The court granted the writ, and the collector appealed.

The parties herein will be referred to as they appeared in the trial court.

The defendant answered, pleading the Harrison Narcotic Act, the statutes of Kansas and the interpretations thereon by the Supreme Court of the State of Kansas, and alleged that under said laws he had no authority to issue the licenses prayed for, and asked that the cause be dismissed.

Title 26 U.S.C.A.Int.Rev.Code, § 3220, Rev.Act 1926, Sec. 703, provides:

"On or before July 1 of each year every person who imports, manufactures, produces, compounds, sells, deals in, dispenses, or gives away opium or coca leaves, or any compound, manufacture, salt, derivative, or preparation thereof, shall pay the special taxes hereinafter provided. Every person upon first engaging in any of such activities shall immediately pay the proportionate part of the tax for the period ending on the following June 30.

$$* \qquad * \qquad * \qquad * \qquad *$$

"(d) *Physicians, dentists, veterinary surgeons, and other practitioners.* Physicians, dentists, veterinary surgeons, and other practitioners, lawfully entitled to distribute, dispense, give away, or administer any of the aforesaid drugs to patients upon whom they in the course of their professional practice are in attendance, $1 per annum or fraction thereof during which they engage in any of such activities."

The plaintiffs contend that since it is the duty of the collector to issue licenses to distribute, dispense, give away or administer narcotic drugs, to physicians in the State of Kansas, and that since the laws of Kansas define those engaged in the practice of osteopathy as "physicians", that it is the duty of the collector to recognize osteopathic physicians as "physicians."

■ The issue is whether or not osteopathic physicians, under the laws of Kansas, have the right to administer narcotic drugs, and must be determined by the statutory law of Kansas, as interpreted by its Supreme Court. Perry v. Larson, 5 Cir., 104 F.2d 728.

Section 65-615 G.S.Ann.1935 provides: "*Opium or coca leaves; penalty for keeping.* It shall be unlawful for any person to keep or have in his possession or under his control, for personal use or otherwise, any opium or coca leaves or any compound, salt, derivative or preparation thereof, and such possession or control shall be presumptive evidence of a violation of this section; or to permit another to have or keep or use any of said drugs on any premises owned or controlled by him, or to sell or give away or furnish any of said drugs to another, except physicians, dentists, veterinary surgeons, registered nurses, or registered pharmacists as hereinafter provided. * * *"

The Kansas statutes also provide under what terms and conditions drugs and narcotics may be dispensed but limits the dispensing or distribution of said drugs to a patient to "a physician, dentist or veterinary surgeon registered under the laws of the state of Kansas in the course of his professional practice only." Gen.St.1935 § 65-616(a). The statutes also provide for a Board of Examiners, who shall examine and license persons intending to practice medicine or surgery, and make provision for requirements as to the course of study, the examination, et cetera. They also provide for a Board of Examiners, who shall examine and license all persons desiring to practice osteopathy.

Section 65-1005 G.S.Ann.1935, provides: "Any person shall be regarded as practicing medicine and surgery within the mean-

ing of this act who shall prescribe, or who shall recommend for a fee, for like use, any drug or medicine, or perform any surgical operation of whatsoever nature for the cure or relief of any wounds, fracture or bodily injury, infirmity or disease of another person, or who shall use the words or letters 'Dr.,' 'Doctor,' 'M.D.,' or any other title, in connection with his name, which in any way represents him as engaged in the practice of medicine or surgery, or any person attempting to treat the sick or others afflicted with bodily or mental infirmities, or any person representing or advertising himself by any means or through any medium whatsoever or in any manner whatsoever, so as to indicate that he is authorized to or does practice medicine or surgery in this state, or that he is authorized to or does treat the sick or others afflicted with bodily infirmities, but nothing in this act shall be construed as interfering with any religious beliefs in the treatment of diseases."

And the same act provides a penalty for practicing medicine or surgery without a certificate. The same statute, (65-1201 G. S.Ann.1935 passed in 1913) provides for the examination of persons desiring to practice the profession of osteopathy. "Any person not now a registered osteopathic physician of this state, before engaging in the practice of osteopathy in this state shall make application to the board of osteopathic examination and registration, on a form prescribed by the board, for a certificate to practice osteopathy. * * * If such examination is passed in a manner satisfactory to the board, then the board shall issue to said applicant a certificate granting him the right to practice osteopathy in the state of Kansas, as taught and practiced in the legally incorporated colleges of osteopathy of good repute."

This case largely turns upon the definition of physician and osteopathic physician, the plaintiffs contending that the term physician embraces osteopathic physician and, therefore, when the statute refers to physicians, it includes osteopathic physicians. The defendant, however, contends that the term physician is a definite term, not only recognized in medical science but by the Legislature of Kansas as well, as referring specifically to those authorized to practice surgery and medicine; that under medicine, is included the study, knowledge, and administration of drugs for the relief of pain and for their curative value as affecting any disease or affliction of the body; that surgery has a definite and distinct meaning—manual operation; that osteopathy has been defined by the laws of Kansas as "a method of treating diseases of the human body without the use of drugs, by means of manipulation applied to various nerve centers, chiefly those along the spine, with a view to inducing free circulation of the blood and lymph, and an equal distribution to the nerve forces."

The Act of 1913, giving the right to practice osteopathy in the state of Kansas "as taught and practiced in the legally incorporated colleges of osteopathy of good repute," provides the basis upon which the plaintiffs seek relief. It is necessary, therefore, to determine just what is meant under the laws of Kansas by the term "physician" and by the term "osteopathic physician."

In State v. Johnson, 1911, 84 Kan. 411, 114 P. 390, 391, 41 L.R.A.,N.S., 539, the Supreme Court of Kansas dealt with this very question. It defined osteopathy, medicine and surgery, and said:

"Osteopathy is carved out as a separate department, and registration and license are required, while its practitioners are prohibited from giving medicine and performing surgical operations; that is, from practicing medicine and surgery as distinguished from osteopathy. But 'medicine and surgery,' which the appellee is charged with attempting to practice, by common use and adjudged meaning cover a wide portion of the domain of healing, and may and should be held to cover the case of one who, not claiming to be a physician or surgeon, really practices osteopathy under another guise without possessing the qualifications required of the osteopath. 'Osteopathy' is defined (Webster's New International Dictionary) as: 'A system of treatment based on the theory that diseases are chiefly due to deranged mechanism of the bones, nerves, blood vessels, and other tissues, and can be remedied by manipulations of these parts.' It has been judicially defined as: 'A method of treating diseases of the human body without the use of drugs, by means of manipulations applied to various nerve centers—chiefly those along the spine—with a view to inducing free circulation of the blood and lymph, and an equal distribution of the nerve forces. Special attention is given to the readjustment of any bones, muscles, or ligaments

not in the normal position.' Words and Phrases Judicially Defined, vol. 6 [First Series], p. 5070. 'Medicine' is defined (Webster's New International Dictionary) as: 'The science and art dealing with the prevention, cure, or alleviation of diseases; in a narrower sense, that part of the science and art of restoring and preserving health which is the province of the physician as distinguished from the surgeon and obstetrician.' He defines 'surgery' as: 'Art or practice of healing by manual operation; that branch of medical science which treats of mechanical or operative measures for healing diseases, deformities, or injuries.'

\* \* \* \* \*

"The Legislature has by the statutes referred to treated osteopathy as a separate department and covered all the other branches of the healing art by the term 'medicine and surgery.' As new schools of practice come into favor, their followers must possess the requirements for the practice of medicine or surgery or prevail upon the Legislature to make separate provision for them as it has done for the osteopath."

In 1925 the Supreme Court of Kansas again had occasion to consider the same question and in that case, State ex rel. v. Eustace, 117 Kan. 746, 233 P. 109, the court said:

"We must look to the law books for the definition of the term. 3 Words and Phrases, Second Series 803, defines osteopathy as: 'A method of treating diseases of the human body without the use of drugs, by means of manipulation applied to various nerve centers, chiefly those along the spine, with a view to inducing free circulation of the blood and lymph, and an equal distribution of the nerve forces. Special attention is given to the readjustment of any bones, muscles, or ligaments not in the normal position. It is that method of the healing art accomplished by a system of rubbing or kneading the body.'

\* \* \* \* \*

"Osteopathy when practiced by a physician or surgeon as is defined in section 65—1005 may be and probably is a part of the art or science of healing, but the practice of osteopathy, while it may be a part of the art of healing, is not comprehended within the term 'practicing medicine,' nor within the term 'surgical operation' as used in section 65—1005 of the Revised Statutes. Section 65—1508 of the Revised Statutes, providing that nothing in the optometry act shall be construed as preventing regular registered physicians and surgeons from practicing optometry, does not include those who are registered to practice osteopathy."

Later, in 1938, in State ex rel. v. Gleason, 148 Kan. 1, 79 P.2d 911, 917, the Supreme Court of Kansas again reviewed this question and said:

"They argue that the intentional removal of this restriction on osteopaths contained in the 1901 statute indicates a legislative intent to authorize osteopaths to administer drugs and perform operations in surgery without restriction. It seems clear the legislature intentionally omitted the prohibitory phrase contained in the 1901 act from the act of 1913 (ch. 290), but it does not follow that thereby the legislature intended to confer unrestricted authority on osteopaths to administer drugs and perform operations in surgery. Considering the fact that surgery in its primitive and broadest sense includes adjustment of bones, muscles, ligaments and nerves by manual operation, and that skill in doing so is taught in osteopathic schools and colleges, and occupies a major place in the science or system of osteopathy, and in the practice of osteopathy, the prohibition against osteopaths performing operations in surgery contained in the 1901 act was, at its best, an inaccurately used expression, and should have been omitted for that reason alone. The science or system of osteopathy, generally speaking, strongly opposed the use of drugs as remedial agencies in treating the sick, afflicted, or injured, and osteopathic schools and colleges of good repute contained no course for the study of materia medica; hence, there was no real occasion to prohibit osteopaths from using drugs, since they made no claim or pretense of doing so, nor did they study to qualify themselves for such use. Broadly speaking, theirs was a drugless system of healing. Surgery, as well as obstetrics (Yard v. Gibbons, 95 Kan. 802, 149 P. 422), and each of the other subjects in which osteopaths were required to take an examination, were taught in the osteopathic schools and colleges of good repute, in harmony with the osteopathic theory or system of healing, and not as taught in the medical colleges and universities. So the word 'surgery,' as used in this statute, meant, in the main, surgery by manual manipulation. The general use of a knife or other instruments in

surgical operations was regarded as unnecessary and opposed to the osteopathic system of treatment. Apparently the legislative intent of the act of 1913 (Ch. 290) was to recognize the system of osteopathy as then taught in its schools and colleges of good repute, and to authorize its practice by those who believed in and conformed to its teachings. Our legislature recognized that there is a broad field for the use of such a system of the healing art. If, as is suggested by counsel for defendant, osteopathic schools and colleges of good repute, and those who practice osteopathy, have abandoned their fundamental theory that surgery, in the main, should be confined to manipulation without the use of the knife and other instruments, that fact never has been recognized by the legislature or the courts of this state.

*     *     *     *     *

"Are osteopathic physicians in Kansas licensed (a) to administer drugs and narcotics and practice drug therapy, and are they licensed (b) to perform surgery under the provisions of the osteopathic practice act? Generally speaking, the answer to the first part of this question (a) must be in the negative, insofar as such drugs are given as remedial aids. To the second part of the question (b) the answer must be yes, if confined to surgery as the same was taught and used as a part of the osteopathic system of healing,—which in the main was by manipulation—and the answer should be no, if it extends beyond this into the general field of operative surgery with surgical instruments. In this connection the briefs put to us specific questions, such as: May one licensed to practice osteopathy, under stated circumstances, administer a simple drug, or a specific drug, for remedial purposes, or use surgical instruments? We are not called upon to answer detailed questions of that character, nor would we deem it proper for us to do so. We are called upon to interpret our statutes. We have no difficulty in finding that our legislature recognized the practice of medicine and surgery as one thing, and the practice of osteopathy as another, and that it regarded both schools of healing as having merit, and the practice of each was authorized."

Much of the brief of the defendant and the argument before this court involved the meaning of the term "remedial aids," and the plaintiffs contend that remedial aids do not include what might be designated as palliative aids or narcotics administered solely for relieving the patient of pain.

We might then condense the plaintiffs' contentions to two propositions. First, the provision of the statute, "the right to practice osteopathy in the state of Kansas, as taught and practiced in the legally incorporated colleges of osteopathy of good repute" and, second, "remedial aids."

As to what was taught in schools of osteopathy of good repute in 1913 is a matter of fact. Numerous witnesses, including osteopathic physicians, testified that the use of narcotics was taught in the schools of osteopathy and the osteopathic physicians used narcotics in their practice; that this was the practice in the schools and among osteopathic physicians in 1913. It was also testified that, in the osteopathic college at Kirksville, Missouri, perhaps the leading osteopathic college in the United States, the students were taught not only the principles of osteopathy as that term is generally understood, but they were also taught the use and effect of drugs, of surgery, of optometry, and all other kindred branches of medicine.

In the Gleason case, supra, Gleason was an osteopathic physician and he contended that he had the right, under the act, to practice anything that was taught in the osteopathic college. The Supreme Court held that he had no authority to practice surgery and optometry, and that he had no right to use drugs as remedial aids.

What are we to conclude then that the Legislature meant by "osteopathy * * * as taught and practiced in the legally incorporated colleges of osteopathy of good repute?" Numerous textbooks, catalogues, magazines and medical treatises were referred to in the evidence and extracts from these various publications were admitted in evidence. Certainly "osteopathy" had a definite meaning in 1913.

Referring to the twenty-second annual catalogue, 1914–1915, American School of Osteopathy, Kirksville, Missouri, we quote:

"Instead, as in the old school medical college, of studies relating to drugs and their administration, the osteopathic student has Principles and Practice of Osteopathy and Osteopathic Diagnosis.

"Though the same textbooks are used in many of the classes in the Osteopathic schools that are used in the same classes in the Medical schools, different stress is laid upon different studies and relatively

different importance given and time devoted to the various parts of the same subject."

"The subjects taught in Osteopathic schools are necessarily presented in a manner entirely different from those of medical schools because the principles of the two schools are fundamentally different. Osteopathy is based upon the belief that health depends upon the structural integrity of the body, and that the disease is caused by bony or muscular lesions."

"Medicine is based upon empiricism, except in the cases where disease is caused by germs. The osteopathist believes that health can be restored by correcting the anatomical lesions. The Medical man has learned by experiment that certain nerves can be affected by certain drugs, so, to cure disease he introduces these into the stomach, the blood becomes impregnated with the drugs, it is carried to the affected nerves as well as to every other nerve in the body. This is why the osteopathist is so strongly opposed to drugs—they may stimulate or inhibit the desired nerve but what do they do to all of the rest?"

"The Medical Student has to study materia medica, the nature and effects of the drugs used in his practice. This the osteopathic student does not have to learn but he has instead the principles and practice of osteopathy."

The Report of A. O. A. Committee on Education (Jrl.A.O.A. May, 1915, p. 465) contains the following statement: "The teaching of materia medica and pharmacology in an osteopathic college is a detriment rather than a benefit to the osteopathic student regardless of personal point of view of the instruction; the osteopathic graduate from a school that teaches much and straight osteopathy is better fixed to promulgate and advance the science of osteopathy than the graduate who has a smatter of drugs, even though received from a corps of instructors who deprecate its use."

From an article by A. L. Evans, Editor A. O. A. Osteopathic Magazine (Jrl. A.O. A. October, 1913, p. 81) in speaking of osteopathy, the editor said: "It should no longer seek to evade its responsibility along these lines. It should take its part in the fight against medical tyranny. It should continue to war against the drug curse, the evils that come from drugs, whether patented or prescribed."

In an address by Dr. A. T. Still at the 1913 Annual Meeting of A. O. A. (Jrl. A.O.A. August, 1913, p. 739), this distinguished osteopathic physician said, quoting from the report: "That thirty-nine years ago he had quit the practice of drugs and had sworn that from that day on he would stand by the Divine Architect and study His chief creation—Man."

And in an editorial in the Journal A. O. A. June, 1913, p. 605, it was said: "Osteopathy has demonstrated that health can be restored and maintained without drugs."

In the same Journal for January, 1913, p. 292, an editorial stated: "The difference between the two (medicine and osteopathy) was clear cut and distinct in the public mind. If the public wanted drug medication, it went to the drug doctor. It it had tired of this and believed there might be some truth in the new way which emphasized the minute adjustment of the body structures and environment as a means of restoring function and coordination, if not indeed a restoration of degenerative changes, it sought this new school."

In the same Journal in July, 1913, p. 698, referring to the student, an article contained this statement: "The more thoroughly he knows even drugs used in ordinary medication, the more horrible do the dangers of drug therapy show themselves in his opened eyes."

An editorial in the same Journal in August, 1915, p. 669, referring to Dr. A. T. Still, said: "The man lives and daily refutes the statement that he countenances drugs in any form and for those who cannot hear that voice there is the printed word from which there can be no appeal. No one can begin the study of osteopathy under a mis-apprehension; no one can later in life go into a trance and find that osteopathy is something different from what Dr. Still taught and is still teaching. Incorporated in the by-laws of an osteopathic society are these words 'practicing osteopathy as taught and practiced by Andrew Taylor Still.'"

George M. Laughlin, President of the Kirksville College, in The Journal of Osteopathy, March, 1937, said: "What I am chiefly alarmed about is the tendency for so many of our osteopathic practitioners to neglect osteopathic therapy and resort to the use of drugs about which they know little. These practitioners depend largely upon the directions on the bottle for dosage of such drugs and their indications. Hundreds of concoctions are put out under trade names that are in wide use, not by

256

the best trained medical men but by those, who, if osteopaths, are engaging in a practice not taught by the college here."

These various excerpts from the osteopathic journals and the catalogue from a leading college are set out for the sole purpose of determining what the outstanding members of the osteopathic profession understood, believed and taught as their conception of the term "osteopathy."

The school at Kirksville taught osteopathy; it taught the principles of the various branches of medicine as taught in the leading medical schools of the nation and witnesses testified that they used the same textbooks in the osteopathic college as were used in the leading colleges of medicine. But the mere fact that these subjects were taught in the osteopathic college is not evidence that the graduates of that college had a right to practice anything but osteopathy. In many of the leading schools of America to-day, the principles of communism, facisms and other isms inimical to our form of government are examined and discussed. Not that these schools desire their students to believe these isms but that the students may know what they are and discern between these objectionable theories of government and proper forms of government. These schools insist that they have the right to discuss these various isms under the broad provisions of our Constitution that persons have the right to freedom of speech, religious and political liberty. However, the mere fact that these schools consider these theories cannot be construed as contending that the students have a right to practice the nefarious principles concerning which they had information in college. So, the fact that in an osteopathic college the broad principles of medicine and surgery were investigated and considered, merely for the purpose of giving the student body a knowledge of what those who practice medicine and surgery believe, would not be sufficient to conclude that those licensed to practice osteopathy would have the right to practice medicine or surgery.

Therefore, in 1913 at the time of the enactment of this Kansas law, there was a definite meaning to the term "osteopathy" and that meaning was clearly stated in the opinion by the Kansas Supreme Court as early as 1911, State v. Johnson, supra.

With this conclusion and interpretation of these terms by the Supreme Court of Kansas in 1911, can it be said that the Legislature was in doubt as to what was meant by the terms, osteopathy, medicine, and surgery?

Under the next proposition, the plaintiffs contend that, since the Supreme Court in State v. Gleason, supra, stated that osteopathic physicians in Kansas could not, under the law, administer drugs as remedial aids, it by inference said that osteopathic physicians in Kansas *could administer* drugs not administered as remedial aids. In other words, they argue at length that if a drug be given merely for the purpose of relieving the patient's pain or of causing the relaxation of the muscles until the osteopathic treatment be properly given, then that is a permissible use, under the Kansas statute, of drugs by osteopathic physicians.

All legislation, respecting the use or any limitation on the use of narcotics, is based upon the established fact that narcotic drugs are dangerous. Not that they are poisons within themselves, but are worse than poison. Their excessive use destroys will power, ambition, self respect and in the end, mentality. They make men and women moral perverts. Their influence upon society is most degrading and, therefore, in the importation of narcotics into this country and in their sale, the most careful and rigid regulations have been thrown about their distribution and dispensation.

The responsibility, however, for legally dispensing narcotics is placed upon the Legislatures of the various states, and this court is bound by the construction placed upon such an act of the Kansas Legislature by the Kansas Supreme Court.

It may have been that the Supreme Court, in using the term "remedial aid," used an ambiguous term, but judges are not skilled in the science of medicine nor in the intricate and delicate shades of meaning of technical medical terms. It is generally conceded, however, that narcotic drugs have little or no curative qualities and that the sole purpose in giving narcotic drugs is the temporary relief of pain.

In State v. Gleason, supra, the court said: "The science or system of osteopathy, generally speaking, strongly opposed the use of *drugs as remedial agencies* in treating the sick, afflicted, or injured, and osteopathic schools and colleges of good repute contained no course for the study of materia medica; hence, there was no real occasion to prohibit osteopaths from

using drugs, since they made no claim or pretense of doing so, nor did they study to qualify themselves for such use. Broadly speaking, theirs was a drugless system of healing." (Italics supplied.)

This theory undoubtedly was the basis upon which the Legislature proceeded in the enactment of the 1913 statute and the Legislature must have believed that osteopathic physicians considered themselves qualified to relieve pain under their theory of osteopathic therapy without the use of narcotics.

When the osteopaths were licensed to practice their profession, as indicated by statements from the leaders of their profession, their therapy was designed to relieve pain and other illness by means of manipulation and without the use of drugs. Evidently it was upon the strength of that claim that the Legislature granted them the privilege of practicing their profession of osteopathy in the state of Kansas. If they have now found that their osteopathic therapy will not relieve pain but they must use narcotics or other drugs to secure that end, that need should be addresssed to the Legislature rather than to the courts.

We are, therefore, of the opinion that the statutes of Kansas, as construed by the highest court of that state, prohibit the use, sale, or distribution of narcotic drugs for any purpose by an osteopathic physician.

The judgment of the lower court is reversed and the cause remanded, with instructions to dismiss the bill.