**UNITED ORIENT BANK and Mee Yin, Ltd., Plaintiffs,**

**v.**

**Arthur GREEN, Defendant– Third Party Plaintiff,**

**v.**

**BACHNER, TALLY, POLEVOY & MISHER, Esqs., Third Party Defendant.**

**Nos. 96 CIV. 3115 LAK, 93 B 46174 PBA.**

United States District Court, S.D. New York.

Dec. 23, 1997.

Christopher J. Sullivan, Jane A. Gordon, Herrick, Feinstein LLP, New York City, for Plaintiffs.

Jeffrey Donner, Shain, Schaffer & Rafanello, Bernardsville, NJ, for Defendant/Third Party.

A. Michael Furman, Wilson, Elser, Moskowitz, Edelman & Dicker, New York City, for Third Party Defendant.

## MEMORANDUM OPINION

KAPLAN, District Judge.

The plaintiffs in this case held security interests in the stock certificates and appurtenant proprietary leases for two units in an industrial cooperative building on the west side of Manhattan. Following defaults by the unit holders on obligations owed to both the plaintiff and entities controlled by the defendant, the defendant, now in bankruptcy, purported to cancel the shares and terminate the leases and then resold the units for very substantial sums without applying the proceeds to payment of the debtors' indebtedness to the plaintiffs. The plaintiffs seek to have claims allowed against the bankrupt estate in the full amounts of the debts secured by the units. They seek also a determination that their claims against the debtor are not dischargeable.

*Facts*

*Procedural Posture*

Arthur Green, the defendant, at all relevant times was (a) the president and a director of the cooperative corporation known as 450 West 31st Street Owners Corporation ("Owners"); (b) a general partner of the cooperative sponsor, 31st Street Realty Associates (the "Sponsor") and sole shareholder of Hudson Loft Investors Corp. ("Hudson Loft"), the other partner; and (c) the sole shareholder, president and treasurer of CCR Loft Corp. ("CCR").[1] At the time of the events in question, Sponsor owned a twelve story industrial building located at 450 West 31st Street.

Plaintiffs United Orient Bank ("UOB") and Mee Yin, Ltd. ("Mee Yin"), as will appear in greater detail below, held security interests in the stock and proprietary leases for two of the units in the building. In 1984, the owners of the units defaulted on their obligations to plaintiffs and to the entities controlled by Green. UOB secured judgments against each of the owners. Plaintiffs contend that Green and the entities he controlled purported to sell the units in derogation of their security interests and converted the proceeds to their own use. They commenced a state court action against him in 1986.

Green filed for bankruptcy protection on December 9, 1993.[2] Although the Court has no information as to what had transpired in the state court litigation in the intervening seven years, that action was scheduled as one of Green's liabilities and, of course, stayed by the bankruptcy filing. On April 1, 1994, plaintiffs filed an adversary proceeding in the Bankruptcy Court in which it objected to the discharge of Green's alleged debts to them. Green in turn filed a third-party complaint in the adversary proceeding against Bachner, Tally, Polevoy & Mischer, L.L.P. ("BTPM"), the attorneys who advised him on the transactions at issue. He contends that any liability that he may have to plaintiffs arising out of the transfer of the cooperative shares and leases would be the result of his reliance on the advice of BTPM.

BTPM answered the third-party complaint and demanded a jury trial. On September 20, 1996, this Court withdrew the reference with respect to the adversary proceeding.[3] The plaintiffs and the defendant subsequently stipulated that all issues concerning the allowability and amount of plaintiffs' claims were joined with the determination of the dischargeability thereof.[4] The Court then severed the third-party complaint and proceeded to trial on the complaint in the adversary proceeding and plaintiffs' claims against Green. This is the Court's decision following that trial.[5]

*The Building and the Westway Project*

Before proceeding to the details of the transactions at issue, it is important to note the relationship between the building and the ill-fated Westway project, a proposal to fill a portion of the Hudson River along the west shore of lower Manhattan and build a new highway to replace the then aged and decrepit West Side Highway. The project gen-

---

1. Pretrial Order ("PTO") ¶ 3. (Unless otherwise indicated, all references to paragraphs of the pretrial order are to Section III, which contains facts stipulated by the parties.)

2. On the same day, Hudson Loft also filed a Chapter 11 petition. On April 14, 1994, Hudson Rondout Corp., another Green entity, likewise filed under Chapter 11. The three cases were consolidated by the Bankruptcy Court on November 11, 1994 in view of the substantial overlap of the debtors' assets and liabilities.

3. *In re Green*, 200 B.R. 296 (S.D.N.Y.1996).

4. Stipulation of consent by and between plaintiffs and defendant/third party plaintiff regarding motion for an order joining all issues arising from defendant/third party plaintiff's denial of any debt to plaintiffs with existing issues in this action, Oct. 24, 1996.

5. One of the defendant's witnesses, a real estate appraiser, was unavailable to testify on the date of the trial. As the witness was to be called only to testify as to the fair market value of the units as of dates on which defendant claimed plaintiffs' security interests were terminated, the materiality of which was disputed, the parties agreed that the matter would be taken under submission and that the record would be reopened if the Court determined that the evidence in question was material. As the Court has determined that the security interests were not terminated on the dates that defendant claims, *infra*, the testimony is not material.

erated controversy and litigation[6] in direct proportion to its enormous scope and cost and ultimately died.

The building at issue here appeared to be in the path of the Westway project. Sponsor's offering plan, dated June 23, 1980, warned prospective investors that the building would be condemned if Westway were approved and the building proved to be within the path shown in the final plans.[7] The market for units in the building was affected adversely for a significant part of the interval until the project finally was abandoned on September 20, 1985.[8]

*The Events at Issue*

*The Initial Sales of the Units*

The units at issue here were sold to Andrew Woo and a company he controlled, Desire Sales, Inc. ("Desire") in 1981 and 1982.

*Unit 3*

On April 1, 1981, Desire purchased the stock certificate and appurtenant proprietary lease for Unit 3 in the building for $250,000. It made a down payment of $25,000 and gave promissory notes to Sponsor in the amounts of $25,000, which was due July 1, 1981, and $200,000, which was payable in installments culminating on April 1, 1988, for the balance. The notes each were secured by a lien on the stock and lease which was subordinate only to the lien of Owners for any unpaid maintenance.[9]

At the time of the sale of Unit 3 to Desire, Sponsor and Owners entered into a so-called Recognition Agreement, in the form of a letter from Sponsor to Owners, by which Owners afforded substantial assurances to Sponsor, as the holder of security interests in the stock and lease associated with Unit 3, that it would not take action that would prejudice Sponsor's security.[10] The Recognition Agreement provided in pertinent part as follows:

"2.   * * *

(c) You will notify us of any notice of intention to terminate the Lease, and

"(1) If the Lessee's default can be cured by the payment of money, you will notify us promptly of any default involving an amount equal to or exceeding three months maintenance payments and will take no action to terminate the Lease or cancel the shares if the default be cured either by us for the account of the Lessee or by the Lessee within 15 days after such notice of default or intention to terminate;

* * *

(e) You shall recognize our right as lienor against the Unit pursuant to the Security, and, if the Lease be terminated and or shares canceled, against the net proceeds of any sale or subletting of the Unit after reimbursement to you of all sums due you under the Lease.

"3.   * * *

(b) Notwithstanding any apparent authority granted to us under agreements with the Lessee, WE SHALL HAVE NO RIGHT OR POWER TO TRANSFER THE UNIT UPON

---

**6.** *See generally, e.g., Sierra Club v. U.S. Army Corps of Engineers,* 776 F.2d 383 (2d Cir.1985); *id.* 772 F.2d 1043 (2d Cir.1985); *id.* 732 F.2d 253 (2d Cir.1984); *id.* 709 F.2d 175 (2d Cir.1983); *id.* 701 F.2d 1011 (2d Cir.1983); *id.* 695 F.2d 643 (2d Cir.1982).

**7.** PTO ¶ 11; Green Ex. 1, at 3 ¶ 1.

**8.** The parties have stipulated that the project was "publicly declared to be canceled" on September 20, 1985. PTO ¶ 35. Any person with the slightest awareness of events in New York City knew some time before that date that there was a material question as to whether the project ever would be built.

**9.** PTO ¶ 15; PX 5, PX 6; *see* PX 4, at 57 (Owner's By-Law creating first lien on shares to secure tenant's obligations to Owners); PX 6, at 2 (security agreement with Sponsor recognizing lien of Owners).

**10.** At the time the Recognition Agreement was signed, Green controlled Owners and in substance was Sponsor. As control of Owners would have passed to others as additional units in the building were sold, it was very much to Green's interest as the secured lender who, through Sponsor, financed Desire's purchase of Unit 3 to ensure that the cooperative corporation could not later take action that would interfere with his secured position.

FORECLOSURE OR OTHERWISE EITHER TO U.S. OR ANYONE ELSE WITHOUT YOUR APPROVAL AS REQUIRED BY THE LEASE provided, however, that nothing contained herein shall limit any rights we may have to dispossess the Lessee pursuant to law or realize our Security in accordance herewith.

\* \* \*

"4. While we have the right but no obligation to cure the Lessee's default under the Lease, if we do not do so within the time provided for herein, you shall have no obligation to us, except that in the event of sale or subletting the Unit, you shall recognize our rights as lienor against the net proceeds of any sale or subletting (after reimbursement to you of all sums which are due to you under the Lease)."[11]

In addition, the Recognition Agreement required that all notices be in writing and sent by registered or certified mail in order to be valid.[12]

*Unit 4*

Andrew Woo, the principal of Desire, purchased the stock certificate and appurtenant proprietary lease for Unit 4 on June 15, 1982 for $250,000 of which $25,000 was paid in cash and the balance by a purchase money note to Sponsor. As in the case of Unit 3, the note was secured by liens on the stock and proprietary lease allocable to Unit 4 subject only to the lien of Owners for any unpaid maintenance.[13] On or about January 25, 1983, Sponsor assigned Woo's note and its security interest in the stock certificate and lease to Chemical Bank to secure a loan to Sponsor in the amount of $250,000.[14]

*The Creation of Plaintiffs' Security Interests*

On or about July 22, 1983, Woo, Desire, Owners, plaintiffs and Chemical entered into a series of agreements by which plaintiffs came to hold security interests in the stock and appurtenant proprietary leases for Units 3 and 4.[15]

With respect to Unit 3, Owners assigned Desire's $200,000 purchase money note and the security interest pertaining thereto to Mee Yin.[16] By virtue of this assignment, Mee Yin obtained the senior security interest (subject only to Owners' lien for any unpaid maintenance) and succeeded also to the rights of Sponsor under the Recognition Agreement.[17] In addition, UOB obtained a secondary security interest in the stock certificate and the lease for Unit 3 to secure certain debts owed to UOB by Desire, its principal Andrew Woo, and other companies in which Woo had interests or debts of which Woo had guaranteed.[18] Moreover, Owners entered into another Recognition Agreement with UOB in relation to its newly created secondary security interest which contained substantially the same provisions as the earlier Recognition Agreement.[19]

With respect to Unit 4, Mee Yin, Sponsor, Chemical Bank and BTPM entered into an agreement whereby Chemical and Sponsor consented, *inter alia*, to the creation of a secondary security interest in Unit 4 in favor of UOB.[20] At the same time, Owners and UOB executed a Recognition Agreement that in all material respects was identical to that executed in connection with Unit 3.[21]

*The Defaults and Green's Grabs for the Collateral*

The Woo interests did not fare well following the July 1983 transactions. Woo evidently was arrested and convicted on narcotics

---

**11.** PTO ¶¶ 19–21; PX 28.

**12.** *Id.* ¶ 20; PX 28, at 3.

**13.** PTO ¶ 40.

**14.** PTO ¶ ; PX 19.

**15.** *See generally* Green Ex. 8, at 1; PX 101, ¶¶ 4–19.

**16.** The principal owing on the note then was $194,440.83. PTO ¶ 16.

**17.** PTO ¶ 19; PX 27.

**18.** PTO ¶¶ 16–17.

**19.** PTO ¶¶ 21–23; PX 30.

**20.** PTO ¶ 42; PX 22.

**21.** PTO ¶ 43; PX 31.

charges.[22] In any case, Desire defaulted in the payment of maintenance charges on Unit 3 immediately following the transactions. Although those defaults were cured, it defaulted again for the months of November and December 1983. This prompted Owners to give notice of default to Desire and, on April 11, 1984, to write to UOB as follows:

"Pursuant to two (2) notices delivered to Desire ... with respect to its Proprietary Lease for [Unit 3] Desire ... has elected to surrender up the Premises to 450 West 31st Street Owners Corp. Please be advised that 450 West 31st Street Owners Corp. has canceled its capital stock allocable to the Premises and shall sell such stock pursuant to the terms of the Uniform Commercial Code."[23]

No notice of any kind was given to Mee Yin.

Although Owners' letter to UOB stated that the stock allocable to Unit 3 had been canceled, that statement was false. Nor did Owners sell the collateral in accordance with the Uniform Commercial Code. Rather, on May 31, 1984, Green and his brother, acting as the board of directors of Owners, issued a resolution canceling the stock certificate, terminated the proprietary lease, and purported to issue a new stock certificate in the name of Owners.[24]

While all this was going on, Woo fell into default on the purchase money note to Sponsor on Unit 4 for the months of April through September 1984. On September 12, 1984, Sponsor gave notice of default to Woo and, a week later, advised UOB of the situation by letter.[25] The letter stated, *inter alia,* that if Woo did not cure the default by September 21, Owners would "have no alternative but to exercise [its] remedies under the Uniform Commercial Code and security agreement with Mr. Woo in order to effectuate a sale of the shares of stock and proprietary lease securing the note to us."[26]

UOB responded to Owners' threat on September 27, 1984. It advised Owners that it held a security interest in Unit 4, demanded that Owners notify UOB "of any proposed disposition of the shares ... and proprietary lease," asked to be kept informed of any private sale as it "may be aware of prospective purchasers," and insisted that Owners "apply the proceeds of any sale of Unit No. 4 to the satisfaction of Woo's indebtedness to United Orient Bank."[27]

In the meantime, UOB had been pursuing its remedies against both Desire and Woo, which had defaulted on their obligations to UOB as well as to Owners. On February 8, 1994, it obtained a judgment against Desire in the amount of $205,115.[28] On September 19, 1984, it issued a restraining notice to Owners barring Owners from making any sale, assignment, or transfer of any property belonging to Desire.[29] Then on September 24, 1994, it obtained a judgment against Woo in the amount of $701,348.31 and the next day served a similar restraining notice on Owners with respect to property of Woo.[30]

The restraining notices by their terms remained in effect for one year absent satisfaction of the judgments, which did not occur. Nevertheless, on March 15, 1995, Green caused Owners to issue a new stock certificate with respect to Unit 4 in the name of Sponsor.[31]

Thus, by mid–1985, the situation was as follows:

1. The owners of Units 3 and 4 had defaulted on their obligations to Owners and Sponsor, respectively, as well as their obligations to plaintiffs.

2. Owners had notified UOB, but not Mee Yin, that it had canceled the shares associat-

---

22. PX 90, at 1.

23. PX 42; PTO ¶ 31.

24. PTO ¶ 32; PX 43.

25. PTO ¶ 45–46; PX 52.

26. PX 52.

27. PTO ¶ 50; PX 56.

28. PX 39.

29. PX 51. The restraining notice was issued pursuant to N.Y. CPLR § 5222.

30. PTO ¶¶ 48–49; PX 54–55.

31. PTO ¶ 52.

ed with Unit 3, which was untrue at the time the statement was made, and that it would sell the Unit in accordance with the Uniform Commercial Code.

· 3. Rather than sell Unit 3 in accordance with the Code, Owners subsequently canceled the stock and issued a new stock certificate to itself without notice to plaintiffs.

4. UOB had demanded notice of any proposed disposition of Unit 4 and that the Unit be sold in accordance with the Code.

5. Owners was restrained from disposing of any property in which Desire or Woo owned an interest until September 1995.

6. Owners nevertheless had issued a new stock certificate for Unit 4 to Sponsor.

*The Cancellation of Westway and Green's End Game*

So matters stood, no doubt in consequence of the restraining notices, for some time. By late 1984 and certainly the summer of 1985, however, the future of the Westway project was very much in doubt, and this had a beneficial effect on the market for units in the building.[32] Although the restraining notices remained in effect and UOB had demanded notice of any proposed disposition, Sponsor—without any further notice to plaintiffs—on September 12, 1985 entered into a contract to sell Unit 4 for $400,000.[33] On September 19, 1985, the Governor Cuomo, Senators Moynihan and D'Amato, and Mayor Koch all announced that the Westway effort would be abandoned, and the project was canceled officially on September 25.[34] The Unit 4 sale closed by the end of the month with none of the proceeds of that sale going to plaintiffs. That left only Unit 3 to be dealt with.

In October 1985, BTPM advised Green that it would be best—"given the situation with United Orient Bank"—to transfer title

to Unit 3 to a new corporation in consideration of unpaid maintenance charges.[35] In early December, Green caused Owners to sell the stock certificate and appurtenant proprietary lease for Unit 3 to CCR for $63,-307.20, the amount of Owners' lien for unpaid maintenance charges.[36] On August 6, 1986, CCR sold Unit 3 to Capital Testing Corporation ("Capital") for $785,000, none of which was paid to UOB or Mee Yin.[37]

*Discussion*

## I. Plaintiffs' Claims

### A. The Parties' Contentions

Plaintiffs' claim is simply stated. Green, they contend, engaged in a scheme the object of which was to destroy plaintiffs' security interests in Units 3 and 4 and thus to divert to himself the entire proceeds of the Capital and Mackie sales. The critical step in Green's scheme, according to plaintiffs, was the purported cancellation of the shares and leases for the units and subsequent issuance of shares for those units to Green-controlled entities, the purpose of which was to cut off plaintiffs' interests in the collateral. Plaintiffs contend, however, that the scheme was rendered ineffective, regardless of the effect of the cancellations and share issuances, by the terms of the Recognition Agreements. The Recognition Agreements gave plaintiffs security interests not only in the shares and leases for the units themselves, but in the net proceeds of any sales thereof. As the only events capable of extinguishing the plaintiffs' security interests were the Capital and Mackie sales, they argue, their liens attached to the proceeds of those sales.

For his part, Green asserts that his entities at all relevant times held liens superior to the plaintiffs. He contends that he had the right to take the actions he did, that he complied with his obligations under the Code

---

**32.** In December 1984, UOB's counsel advised Green's lawyers that it had a prospective purchaser at $310,000 for one of the units. Green Ex. 35. In January 1985, there was an indication of interest in both Units 3 and 4 at a price of $340,000 each. Green Ex. 36. Owners sold Unit 10 for $530,000 in July 1985 and was in negotiations for the sale of Unit 4 for $400,000 no later than August 12, 1985. PX 66, PX 67.

**33.** PTO ¶ 53.

**34.** Green Ex. 39.

**35.** PTO ¶ 36; PX 75.

**36.** PTO ¶¶ 37–38. In fact, however, no money changed hands.

**37.** PTO ¶ 39.

and the Recognition Agreements, and in any case that plaintiffs were not injured because the value of the units at the dates of any breaches were such that plaintiffs would have fared no better had no breaches occurred.

### B. The Effect of Green's Actions Prior to the Capital and Mackie Sales

The Recognition Agreements clearly gave plaintiffs security interests in the net proceeds of any sales of these units. Moreover, they barred Owners from terminating the leases or canceling the shares absent prior notice to the plaintiffs. The threshold question is whether any of the events that preceded the ultimate sales of the units extinguished the plaintiffs' security interests in the proceeds of those transactions.

### Unit 3

Two events intervened between Desire's ownership of Unit 3, subject to the liens of Owners and plaintiffs, and the ultimate sale to Capital: Owners' purported (i) cancellation of Desire's shares and issuance of shares to itself in May 1984, and (ii) conveyance to CCR in December 1985.

It is clear at the outset that the cancellation of Desire's shares and lease and the issuance of new shares to Owners were blatant violations of the Recognition Agreements and the proprietary lease. The Recognition Agreements prohibited Owners from taking any action to cancel the Desire stock and lease absent prior notice to plaintiffs. The March 1984 letter that falsely stated that the stock had been canceled certainly did not constitute prior notice, and there was no notice at all of the actual May cancellation. Similarly, paragraph 19(b) of the lease required Owners to give notice of any default and an opportunity to cure to any secured parties, another requirement that was not adhered to. But this is virtually beside the point.

Under the Uniform Commercial Code, junior liens are extinguished only if one of two provisions is complied with. Section 9–504(4)

provides that the disposition of collateral by public or private sale pursuant to that section discharges subordinate security interests if certain requirements are met.[38] Section 9–505 permits a secured party, after giving notice to the debtor and other secured parties of which it is aware and receiving no objection, to retain the collateral in satisfaction of the debt.[39] Owners, however, did not proceed pursuant to either provision. Its March 1984 letter indicated that it would sell the collateral pursuant to the Uniform Commercial Code, a statement utterly inconsistent with any suggestion that it intended to retain the collateral in satisfaction of Desire's debt, so Section 9–505 has no bearing. And as no notice of any sale was given, Owners cannot be regarded as having proceeded under Section 9–504.[40] In consequence, plaintiffs' security interest in the stock and lease for Unit 3, and in the proceeds of any sale thereof, survived the May 1984 cancellation and the issuance of new shares for that unit to Owners.

The December 1985 transfer to CCR stands Green in no better stead. The conclusion that plaintiffs' security interest in Unit 3 and in the proceeds of any sale thereof survived the May 1984 cancellation means that the transfer to CCR could have cut off that interest only if the notice required by Sections 9–504(3) or 9–505 was given. But Owners gave no notice of any kind. In consequence, the security interest survived and attached to the proceeds of CCR's transfer to Capital.

### Unit 4

The analysis in the case of Unit 4 is even simpler. The only event that even arguably might have terminated the plaintiffs' security interests was the March 15, 1995 issuance by Owners to Sponsor of a new stock certificate with respect to that unit. No notice was given to anyone. In consequence, Owners' action certainly did not terminate the plaintiffs' security interests under Section 9–504 or 9–505 of the Code. Moreover, its action in doing so manifestly breached the Recognition

---

**38.** N.Y. UNIF. COMM. CODE ("UCC") § 9–504(4) (McKinney 1990).

**39.** Id. § 9–505.

**40.** See id. § 9–504(3).

Agreement. It appears also to have violated paragraph 17 of the proprietary lease, which permitted termination of a lease only upon receipt of written request by a secured lender that the lease be terminated and only by invocation of the conditional limitation clause contained in paragraph 31, neither of which occurred. The security interest in the stock, the lease, and the proceeds of the sale of the unit therefore remained in existence when Sponsor sold Unit 4 to Mackie and Demast in 1986.

\* \* \*

Green's response to the foregoing is twofold, although the arguments are closely related. First, he contends that the security interests of plaintiffs, although plaintiffs perhaps were not given all the notice that was required, were terminated because plaintiffs were made aware of the defaults of Desire and Woo but failed to cure those defaults. In any case, he goes on to argue that the units were "virtually unsalable" at the time of any failure to give notice in strict accordance with Code Section 9–504(3) and, in consequence, there were no damages. The short answer to these contentions is that the assumptions upon which they are based are incorrect.

To begin with, neither the Recognition Agreements nor the Code obliged plaintiffs to cure defaults by Desire and Woo in order to preserve their security interests. To the contrary, the Recognition Agreements specifically provided that plaintiffs had the right, but not the obligation, to cure such defaults. And while a sale under Code Section 9–504 would have terminated the security interests of subordinate creditors, there was no such sale. As explained above, the security interests remained in place at the time of the ultimate sales to Capital and Mackie.

Nor is there anything to be made out of the very limited notice that was given. The April and September 1984 letters to UOB with respect to Units 3 and 4, respectively, each stated in substance that the unit would be sold pursuant to the terms of the Uniform Commercial Code. Plaintiffs therefore were assured—falsely, as it turned out—that the notice requirements of Section 9–504(3) would be complied with and in any event, and viewing the matter in the light most favorable to Green, that Owners would not be the buyer if there were a private sale.[41]

Finally, the notion that there were no damages is based on the contention that plaintiffs are entitled only to be placed in the position they would have been in had proper notice been given. This argument, however, presupposes that their security interests were terminated by Green's transfers of the units which, as demonstrated above, is incorrect.

But all of this is beside the point for another, independently sufficient reason. Defendant's arguments all are based on the notion that the transfers among the Green entities have legal significance vis-a-vis the plaintiffs. That, however, is not the case.

### C. The Separate Existence of CCR and Sponsor Must Be Disregarded

While the presumption of corporate independence and limited shareholder liability is not lightly to be disregarded, there are circumstances in which courts will look to the substance rather than the form and impose liability directly on individual shareholders.[42] The corporate veil will be pierced in New York where:

"'(1) [the owner] ha[s] exercised such control that the [corporation] has become a mere instrumentality of the [owner], which is the real actor; (2) such control has been used to commit a fraud or other wrong; and (3) the fraud or wrong results in an unjustified loss or injury to plaintiff.'"[43]

In this case, any separate existence of CCR must be disregarded. Green testified that he sought to incorporate an entity

---

**41.** The secured party may not buy at a private sale of collateral like that at issue here, collateral of a type not "customarily sold on a recognized market." UCC § 9–504(3).

**42.** *E.g., Freeman v. Complex Computing Co.*, 119 F.3d 1044, 1052 (2d Cir.1997).

**43.** *Id.* (quoting *Wm. Passalacqua Builders, Inc. v. Resnick Developers S., Inc.*, 933 F.2d 131, 139 (2d Cir.1991)); *accord, Thrift Drug, Inc. v. Univ. Prescription Adm'rs*, 131 F.3d 95, 97–98 (2d Cir. 1997).

named CCR Corp. in December 1985 for the sole purpose of taking title to Unit 4.[44] The name proved to be unavailable, however, so the papers were rejected, and the corporation that eventually was formed in January or February 1986—with Green as its sole stockholder, president and treasurer—was named CCR Loft Corp.[45] Thus, CCR did not even exist at the time the conveyance nominally made to it closed.[46] Nor did it ever have any assets other than the interest it purportedly acquired in Unit 3.[47] Green nevertheless caused an employee of another of his companies to sign the contract of sale, purportedly on its behalf.[48] As Green put it at trial, "Basically, you are talking about one entity. You could be calling it CCR, but basically it was Arthur Green."[49] Given this total domination and control of CCR (even if one were to assume that it existed at the relevant date, which it did not) by Green, the only remaining question would be whether it was used to perpetrate a fraud or other wrong on the plaintiffs. That it manifestly was.

As indicated, the intention in forming CCR was solely for it to take the conveyance of Unit 3 from Owners in December 1985. That conveyance in turn took place, as the BTPM letter indicated, solely because of "the situation with United Orient Bank." And "the situation" was obvious. The units had appreciated in value as evidenced by the Mackie sale of Unit 4. Westway had been canceled. Owners was on notice from UOB that it claimed the right to the net proceeds of any sale. So the transfer to CCR, the

Court finds, was an effort to destroy UOB's security interest in Unit 3 to enable Green to realize for himself the entire appreciation in the value of the property.[50] A more bald-faced example of the use of the corporate form for the purpose of perpetrating a fraud or other wrong on another could not easily be imagined. Accordingly, the Court holds that the corporate form of CCR, even assuming that it was a corporation at the relevant time, is to be disregarded in assessing the relationship between the parties to this action.

It is equally clear that Owners was the personal fief of Arthur Green notwithstanding that it was a cooperative corporation. As most of the units had not sold during the period relevant here, he was the owner of 70 to 80 percent of the shares in the corporation.[51] Until early 1987, the company was controlled by Green. He kept its books and records at his home, refused to permit other officers and directors to see them, and used at least one corporate employee to serve as his personal chauffeur. While the board appears to have consisted of Green, his brother, and Lawrence Galasco, Mr. Galasco testified that Green never gave notice of board meetings.[52] In fact, the resolutions canceling the shares and lease allocated to Unit 3 and to sell Unit 4 to CCR purport to have been adopted by Green and his brother as a majority of the directors of Owners—this despite the fact that Mr. Galasco was a director, was not informed of the proposed actions, and never was asked to consider or

44. Tr. 113, 121.

45. *Id.* 113, 121 (stipulating to date of formation).

46. *See id.* 113–17.

47. *Id.* 121. The record demonstrates also that Green treated CCR and Owners, for that matter, as part of his personal pocketbook. Neither CCR nor anyone else ever paid the $63,307 purchase price supposedly paid to Owners for Unit 3. Green sought to explain this by claiming that Owners owed him $63,000 for advances he had made in respect of the unpaid maintenance on the unit. *Id.* at 123–24. The theory therefore apparently is that CCR acquired Unit 3 in exchange for a reduction in the amount of funds owed by Owners to CCR's sole stockholder, Green. The Court finds, however, that there was

no loan by Green to Owners and, in any case, no accounting for any such loans. *See id.* 124–27.

48. *Id.* 117.

49. *Id.* 128.

50. Green sought at trial to give an innocent explanation of the reference to "the situation with United Orient Bank" and claimed that it had nothing to do with the purported transfer to CCR. Tr. 148–54. The Court does not credit his testimony.

51. Tr. 122.

52. PX 99, ¶ 8; Green Ex. 45, ¶ 5; PX 100, ¶¶ 4–5.

approve them.[53] As Green testified at trial:

"Q. So as far as you were concerned, the co-op [Owners] was basically Arthur Green, correct?

"A. Unfortunately, up to a point where we finally started to get some members, yes. Unfortunately, the co-op was basically Arthur Green."[54]

Green manifestly used his complete dominance of Owners to perpetrate a fraud or other misconduct to the detriment of plaintiffs. He caused Owners to cancel the shares of Desire for Unit 3, to issue new certificates for the shares of both units, and to sell Unit 3 to CCR, which in reality was to himself personally, all in derogation of plaintiffs' rights. In these circumstances, the corporate existence of Owners as well must be disregarded for purposes of this action.

Once the separate corporate existence of Owners is put aside, the reality of the situation is crystal clear. Green, through the instrumentality of Owners, was obliged to respect plaintiffs' rights under the Code and the Recognition Agreements. Green disregarded those rights in order to transfer the units to CCR and to Sponsor. CCR did not even exist at the relevant date; when it eventually was formed, it was nothing more than a name used by Green. And Sponsor was a partnership of which Green was general partner and Hudson Loft, of which Green was the only shareholder, was the other partner. Thus, Green secured for himself personally more than $1.1 million in sales proceeds of Units 3 and 4 by violating his obligations to the plaintiffs. Certainly there is no colorable case for the proposition that any of the transfers that one Green instrumentality made to another without complying with any of the relevant provisions of the Code or the Recognition Agreements terminated plaintiffs' security interests in the units. Accordingly, plaintiffs retained their security interests in the units to the point of their sales to Capital and Mackie.

### D. Damages

The net proceeds from the sale of Unit 3 to Capital (after payment to Owners of delinquent charges of $68,807) were $716,193.[55] It is undisputed that the total principal due to Mee Yin and secured by Unit 3 was $194,440.43 plus interest.[56] Accordingly, the claim of Mee Yin is allowed to the extent of $194,440.43 plus interest to the date of judgment.[57]

It likewise is undisputed that the total outstanding amount of the loans from UOB secured by the secondary security position in Unit 3 exceeded $751,073.54.[58] The claim of UOB with respect to Unit 3 therefore is allowed to the extent of the Unit 3 net proceeds remaining after payment of the Mee Yin claim.

The net proceeds from the sale of Unit 4 to Mackie and Demast (after payment to Owners Corp. of delinquent charges in the amount of $37,600 and payment to Sponsor/Chemical Bank of its loan in the amount of $191,000) totalled $171,400.[59] The total outstanding amount of the loans from UOB that were secured by Unit 4 was $751,073.54 plus interest.[60] Accordingly, the claim of UOB is allowed to the extent of the entire net proceeds of the sale of Unit 4, or $171,400

The total amount of UOB's allowed claim therefore is $887,593 ($171,400 plus $716,193) less the amount of Mee Yin's allowed claim.

---

**53.** *Id.* ¶¶ 7–8; PX 76; Green Ex. 21. The resolutions were adopted in violation of Section 708(b) of the New York Business Corporation Law. N.Y. Bus. Corp. L. § 708(b) (McKinney 1986). The documents purport to be written consents in lieu of meetings of the board. The statute, however, requires the written consent of *all* directors in such circumstances.

**54.** Tr. 122.

**55.** Green Ex. 58, at 32; PX 101, ¶ 49.

**56.** *Id.*

**57.** PX 101, ¶ 48.

**58.** *Id.* ¶¶ 47, 50.

**59.** *Id.* ¶ 51.

**60.** *Id.* ¶¶ 47, 50.

## II. Dischargeability

█ Plaintiffs initially contended that Green's debt is not dischargeable under 11 U.S.C. § 523(a)(2)(A) on the ground of fraud. Immediately prior to closing argument, however, they added the contention that the debt is not dischargeable by virtue of Section 523(a)(6), which withholds discharges for any debts "for willful and malicious injury by the debtor to another entity or the property of another entity."[61] As Green did not object to the belated assertion of this contention,[62] which in any case merely offers an alternative legal theory for application to the same facts, the Court entertains the argument.[63]

█ "Willful and malicious conversion clearly falls within" Section 523(a)(6).[64] "Willful" "means 'deliberate or intentional.'" "Malicious" "means wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will."[65] Malice, moreover, "is implied when anyone of reasonable intelligence knows that the act in question is contrary to commonly accepted duties in the ordinary relationships among people, and injurious to another."[66]

In this case, Green's purported cancellation of the shares and leases appurtenant to Units 3 and 4, his issuance of new shares to entities he controlled, and his purported transfer of Unit 3 to CCR all were in blatant disregard of and, indeed, specifically and maliciously intended to abrogate plaintiffs' rights in the collateral in order to secure for himself a benefit that in substantial measure belonged to plaintiffs. Although the intangi-ble nature of the collateral is unusual among cases in this area, Green's actions in principle were no different than those of debtors who deliberately dispose of collateral in disregard of the rights of secured creditors—actions which regularly result in determinations of nondischargeability.[67] In consequence, plaintiffs are entitled to relief on their objections to Green's discharge unless Green's alleged reliance on BTPM affords him a defense.

█ In actions for fraud, good faith and reasonable reliance on counsel may negate the culpable intent that is necessary to liability.[68] The Court therefore assumes that reliance on counsel, in an appropriate case, could preclude one seeking a determination of nondischargeability from establishing the culpable state of mind required by Section 523(a)(6). But the debtor asserting such a position must establish that the debtor relied upon the advice of counsel and that the reliance was reasonable.[69] In the last analysis, the issue is whether adding the alleged reliance on counsel to all of the other facts and circumstances of the case leaves the trier of fact unable to conclude by a preponderance of the evidence that the debtor acted with the requisite intent.

In this case, BTPM was heavily involved in Green's deliberations and actions with respect to these units. Not surprisingly, there is considerable evidence suggesting that it was BTPM which decided exactly what steps Green should take in an effort to achieve his

61. 11 U.S.C. § 523(a)(6).

62. Tr., Oct. 7, 1997, *passim.*

63. As a purely technical matter, this requires amendment of the pretrial order, which is permitted under FED. R. CIV. P. 16(e). In view of the lack of objection by Green and the obvious lack of any prejudice to him, the necessary amendment is allowed.

64. *E.g., In re Kimzey,* 761 F.2d 421, 424 (7th Cir.1985); *Martin v. Key Bank of New York, N.A.,* 208 B.R. 799, 803 (N.D.N.Y.1997) (citing 4 LAWRENCE P. KING, ET AL., COLLIER ON BANKRUPTCY ¶ 523.12 (15th rev. ed.1996) (hereinafter COLLIER)).

65. *In re Stelluti,* 94 F.3d 84, 87 (2d Cir.1996).

66. *In re Stelluti,* 167 B.R. 29, 33 (Bankr.S.D.N.Y. 1994) (internal quotation marks omitted), *aff'd,* 94 F.3d 84 (2d Cir.1996).

67. *E.g., McIntyre v. Kavanaugh,* 242 U.S. 138, 141–42, 37 S.Ct. 38, 39–40, 61 L.Ed. 205 (1916); *In re Petersen,* 175 B.R. 375, 378 (Bankr.D.Idaho 1994); *In re Johnson,* 166 B.R. 365, 366 (Bankr. D.Minn.1994); *In re Suydam,* 151 B.R. 436, 439 (Bankr.N.D.Ohio 1992).

68. *E.g., Tillman v. Wheaton–Haven Rec. Ass'n,* 517 F.2d 1141, 1145 (4th Cir.1975) (advice of counsel not "a defense to a suit ... for an intentional tort"); *United States v. Int'l Bhd. of Teamsters,* 831 F.Supp. 278, 285 (S.D.N.Y.1993).

69. *Id.*

objective.[70] Thus, the Court assumes that Green relied upon the advice of counsel in taking the actions at issue here. But that is not enough in these circumstances.

As noted, reliance on the advice of counsel must be reasonable in order to defeat a claim that the defendant acted with the requisite state of mind. While Green is not a lawyer and the Court, as a general matter, would be reluctant to fault a lay person for trusting his counsel on a technical matter such as the rights of secured parties with respect to collateral, this to use the common colloquialism is the exception that proves the rule. Notwithstanding BTPM's involvement in structuring the steps by which Green sought to eliminate the plaintiffs' security interests, the Court finds that Green's conscious object was to wipe out plaintiffs without justification and to secure Units 3 and 4 for himself. While he manifestly enlisted BTPM in an attempt to accomplish his goal, it is reasonably plain that his instructions were to take the most aggressive possible position with the intention that he would be no worse and possibly better off even if the plaintiffs challenged him. In other words, Green knew that there was, at a minimum, a substantial risk that his actions were improper and elected to run that risk. To paraphrase the *Stelluti* court, Green knew that his actions were "contrary to commonly accepted duties in the ordinary relationships among people, and injurious to" plaintiffs.[71]

Nowhere, perhaps, is this clearer than in the testimony of Andrew T. Nichols, one of Green's lawyers. In discussing the transfer of Unit 3 to CCR, Nichols first testified that he had no recollection of advising Green that the position he recommended that Green take—that the transfer terminated plaintiffs' security interests—"was proper and legal." [72] Rather, "the pros and cons of the position, vis-a-vis CCR Corp. were known to Arthur [Green]. Arthur wanted to take an aggressive position and he wanted us to champion that position ... and that's what we did." [73]

When Mr. Nichols was questioned later in the deposition regarding the "aggressive position" Green wished to take, he testified as follows:

"A * * * I had a number of discussions with Arthur as to what the impact would be, if they weren't served and what we should do. The pros and when I say 'pros and cons' ... when Arthur had a decision he could have said, 'Okay, we didn't give a notice. We didn't technically comply. Let's do what we're supposed to do. If that was the case, then go back and basically undo it.' Or he could take a very aggressive posture and say—my recollection of the terminology on [Arthur's] part was basically, 'Fuck 'em.['] Excuse me. He was looking at it as, 'What do I have to lose? What do I have to lose if we go forward and take an aggressive position against the bank and treat the units as being foreclosed or at least terminated? If, ultimately, the bank sues us and is successful, we would be able to settle out with them,' which is what he tried for quite some time to do.

"Q During those conversations, did Mr. Green ask for your counsel and advise [*sic*] as to these issues?

"A I don't recall, I don't recall specifically doing that. No.

"Q Well, wasn't the reason that the discussion was being held with you, was they he was talking to you as an attorney who had represented him in regard to this project?

"A Not really. Well, I say not really. Yes. But, in response to the last question, Arthur's approach was, can I get away with this."

"Q And?

"A That's—that was his goal. He said he wanted to take a very aggressive position. What I said before was that Arthur wanted to take the most aggressive position with a bang. He was

---

70. *See generally* Green Exs. 7, 12–16, 22, 31.

71. *In re Stelluti, supra* note 66, at 33.

72. Nichols Dep. 151–11/153–2.

73. *Id.* 154–16/20.

looking for a way to carry out the transaction whereby he could diffuse the bank's position and end up with the units." [74]

While BTPM never advised Green that his actions either were or were not proper, this testimony, taken together with the other evidence of record, confirms the Court's view that Green neither asked nor cared whether they were appropriate. His conscious object was to grab the units for himself in derogation of the plaintiffs' rights. He knew that there was a substantial risk that his actions were wrongful, as indeed would have been obvious to any reasonably intelligent person. He cannot now hide behind BTPM's failure to tell him in words of one syllable that he could not lawfully proceed. The Court finds that Green willfully and maliciously injured the plaintiffs and their property within the meaning of Section 523(a)(6). Accordingly, the debt is nondischargeable.[75]

*Conclusion*

For the foregoing reasons, the claim of Mee Yin is allowed to the extent of $194,-440.43 plus interest to the date of judgment. The claim of UOB is allowed claim to the extent of $887,593 ($171,400 plus $716,193) less the amount of Mee Yin's allowed claim. Plaintiffs are entitled to judgment determining that plaintiffs' aforesaid claims are not dischargeable in bankruptcy. The foregoing constitute the Court's findings of fact and conclusions of law.

SO ORDERED.

---

74. *Id.* 211–5/212–4.

75. This conclusions renders it unnecessary to consider plaintiffs' alternate argument that the

debts are not dischargeable under Section 523(a)(2)(A).